**STATE of Iowa, Appellant,**

v.

**Michael Scott KREPS, Appellee.**

No. 01–0571.

Supreme Court of Iowa.

Sept. 5, 2002.

Thomas J. Miller, Attorney General, Mary Tabor and Denise Timmins, Assistant Attorneys General, Richard Crowl, County Attorney, and Christine Delorme, Assistant County Attorney, for appellant.

Linda Del Gallo, State Appellate Defender, and Nan Jennisch, Assistant Appellate Defender, for appellee.

LAVORATO, Chief Justice.

The State sought discretionary review of a district court ruling sustaining the defendant's motion to suppress evidence. The evidence was obtained by a police officer who stopped the defendant's vehicle when a passenger exited the vehicle while it was still moving.

We transferred the case to the court of appeals, which affirmed. We granted the State's application for further review. On that review, we now vacate the court of

appeals' decision and reverse the district court judgment. We remand for further proceedings consistent with this opinion.

## I. Background Facts and Proceedings.

On December 28, 2000, at approximately 2:30 a.m., Officer Craig Johnson of the Carter Lake Police Department observed a red Chevrolet Blazer traveling north on 13th Street. The vehicle turned west onto Cachelin Street. Because there was no traffic at that time of the night, the officer turned around and came back "to check the vehicle out." As the officer was catching up with the vehicle, it sped up and turned north on 11th Street. The vehicle sped up even more. Next, the vehicle turned onto "P" Street, went one block east, then turned back onto 13th street, thereby completing a circle. From 13th Street, the vehicle went one block and turned back onto Cachelin. The officer had difficulty catching up to the vehicle.

As the officer turned onto Cachelin, he saw an individual jump from the vehicle while it was still moving and run in between two houses. The vehicle continued for approximately fifty yards, then pulled over to the curb. At this point, the officer activated his emergency lights and initiated a traffic stop.

The officer approached the vehicle and asked the driver, Michael Scott Kreps, for his driver's license, registration, and proof of insurance. The officer smelled alcohol coming either from Kreps or inside the vehicle, so he asked Kreps to step out and perform some field sobriety tests. The tests indicated "definite signs of narcotic usage," so the officer arrested Kreps and charged him with operating while intoxicated. He asked Kreps to come to the police station for a urine test.

The State charged Kreps with driving while intoxicated, in violation of Iowa Code section 321J.2 (1999). Later, Kreps filed a motion to suppress, which the State resisted. In his motion to suppress, Kreps asked the court to suppress all statements and other evidence obtained following the stop because it was obtained in violation of the Fourth Amendment to the Federal Constitution and the comparable provision of the Iowa Constitution.

At the suppression hearing, the officer testified that as he caught up to the vehicle, it "sped up even more in [an] attempt to lose me, like a cat-and-mouse game." When asked why he stopped the vehicle, the officer explained it was due to "the evasive action and trying to lose me going around the block," combined with "seeing an individual exit the vehicle in a manner that is not consistent with normal people getting out of the vehicle, then [running] between two houses." When asked whether the passenger ran because he was under age and possibly consuming alcohol, the officer responded: "It could be. Carter Lake has a curfew, where individuals under the age of 18 cannot be out past 11."

On cross-examination, the officer added, "I couldn't get a radar lock on him because of the short distances from corner to corner."

On redirect, when asked if there were any additional details that resulted in his stopping the vehicle, the officer added, "[t]he speed that the vehicle was going ... turning the corners was relatively faster than normal traffic does. I felt like there was evasive manner here." The officer further testified that he "felt like there was something wrong" because of the passenger who jumped out of the vehicle and "took off running."

Kreps likewise testified. He described what happened just before the passenger jumped from the car: "And as I was driving, [the passenger] said that, you know,

there is [a] cop behind us. Let me out of the car. Do this and that.... I turned right, back onto Cachelin.... [The passenger] jumped out of the car, and I was still driving[.] [D]oors swung open and everything."

At the end of the hearing, the district court ruled from the bench:

The officer testified that he thought the car was doing a cat-and-mouse evasive action, and although the officer testified that he thought the car was going faster than normal around corners or faster than normal drivers would go around corners, I think, when put to the true question, I don't think the officer could say that the car was exceeding the speed limit, or that he did not see a traffic violation that the driver committed.

So, really, the only thing that the officer has is this person getting out of the car and running through the houses, so I don't think that that leads to probable cause to stop the driver. I don't think that there is reasonable suspicion of criminal activity on the part of the driver because someone gets out of the car and runs through a yard, so I'm going to grant the motion.

We granted the State's application for discretionary review and transferred the case to the court of appeals. The court of appeals affirmed. We granted the State's application for further review.

## II. Issue.

We must determine whether the district court correctly ruled by granting Kreps' motion to suppress. In resolving this issue, we must determine whether the circumstances in this case provided the officer reasonable suspicion sufficient to allow an investigatory stop of Kreps' vehicle. In particular, we must determine whether the manner in which Kreps was driving, combined with the passenger's actions— jumping from the vehicle while it was still moving and running away—gave rise to reasonable suspicion of criminal activity on the part of the driver, thereby justifying the officer's stop of the vehicle.

## III. Scope of Review.

We review constitutional issues de novo, under the totality of the circumstances. *State v. Predka*, 555 N.W.2d 202, 204 (Iowa 1996); *see also United States v. Arvizu*, 534 U.S. 266, 275, 122 S.Ct. 744, 751, 151 L.Ed.2d 740, 750 (2002) (standard for appellate review of reasonable-suspicion determinations is de novo). We give deference to the district court's findings of fact due to its opportunity to assess the credibility of the witnesses. *State v. Turner*, 630 N.W.2d 601, 606 (Iowa 2001). However, we are not bound by those findings. *Id.*

## IV. Applicable Law.

As he did in the district court, Kreps contends that all the statements and evidence obtained after the stop was obtained in violation of the Fourth Amendment to the United States Constitution and in violation of the comparable provision of the Iowa Constitution. The Federal Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." U.S. Const. amend. IV. The Fourth Amendment is made applicable to the states under the Fourteenth Amendment to the Federal Constitution. *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081, 1090 (1961); *State v. Heminover*, 619 N.W.2d 353, 357 (Iowa 2000). The search and seizure clause of the Iowa Constitution is substantially identical in language to the Fourth Amendment. *See* Iowa Const. art. I, § 8. We therefore usually deem the two

provisions to be identical in scope, import, and purpose. *State v. Scott*, 409 N.W.2d 465, 467 (Iowa 1987). Evidence obtained in violation of these provisions is inadmissible, regardless of its relevancy or probative value. *Heminover*, 619 N.W.2d at 357.

■■ The Fourth Amendment imposes a general reasonableness standard upon all searches and seizures. *Scott*, 409 N.W.2d at 467. Generally, to be reasonable, a search or seizure must be conducted pursuant to a warrant issued by a judge or magistrate. *State v. Kinkead*, 570 N.W.2d 97, 100 (Iowa 1997). Unless an exception to the warrant requirement applies, searches conducted without a warrant are per se unreasonable. *Id.*

■■ One exception to the warrant requirement allows an officer to stop an individual or vehicle for investigatory purposes based on a reasonable suspicion that a criminal act has occurred or is occurring. *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906 (1968)). The purpose of an investigatory stop is to allow a police officer to confirm or dispel suspicions of criminal activity through reasonable questioning. *United States v. Hickman*, 523 F.2d 323, 327 (9th Cir.1975). Such a stop and a subsequent detention—even though temporary and for a limited purpose—is a "seizure" within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809–10, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89, 95 (1996); *Heminover*, 619 N.W.2d at 357. Because the stop is a seizure, it is subject to the "constitutional imperative that it not be 'unreasonable' under the circumstances." *Whren*, 517 U.S. at 810, 116 S.Ct. at 1772, 135 L.Ed.2d at 95; *Heminover*, 619 N.W.2d at 357.

■■ To justify an investigatory stop, the officer must be able to point to "specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant that intrusion." *Heminover*, 619 N.W.2d at 357 (quoting *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880, 20 L.Ed.2d at 906). In determining the reasonableness of the particular search or seizure, the court judges the facts against an objective standard: "would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Id.* (quoting *Terry*, 392 U.S. at 21–22, 88 S.Ct. at 1880, 20 L.Ed.2d at 906).

■■ In short,

an investigatory stop of a vehicle is constitutionally permissible only if the officer who has made the stop has specific and articulable cause to reasonably believe criminal activity is afoot. Circumstances raising mere suspicion or curiosity are not enough.

*Id.* at 357–58. The officer must be able to articulate more than an "inchoate and unparticularized suspicion or 'hunch'" of criminal activity. *Illinois v. Wardlow*, 528 U.S. 119, 123–24, 120 S.Ct. 673, 676, 145 L.Ed.2d 570, 576 (2000) (quoting *Terry*, 392 U.S. at 27, 88 S.Ct. at 1868, 20 L.Ed.2d at 909). The motivation of the officer stopping the vehicle is not controlling in determining whether reasonable suspicion existed. *Heminover*, 619 N.W.2d at 361. The officer is therefore not bound by his real reasons for the stop. *Id.* The test for the stop is an objective one and for that reason the State is not limited to the reasons stated by the investigating officer in justifying the stop. *Id.; see also United States v. Hawkins*, 811 F.2d 210, 213 (3d Cir. 1987) ("[T]he legality of the stop must be judged by the objective facts known to the seizing officer rather than by the justifications articulated by them.").

Whether reasonable suspicion exists for an investigatory stop must be determined in light of the totality of the circumstances confronting a police officer, including all information available to the officer at the time the decision to stop is made. *Arvizu,* 534 U.S. at 273, 122 S.Ct. at 750, 151 L.Ed.2d at 749 ("When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."); *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 628–29 (1981); *see also Lewis v. State,* 233 Ga.Ct.App. 560, 504 S.E.2d 732, 734 (1998) ("[t]he question of whether reasonable suspicion exists to stop a vehicle must be measured by current knowledge," that is, at the moment the stop is made and not hindsight) (citation omitted). The circumstances under which the officer acted must be viewed "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *United States v. Hall,* 525 F.2d 857, 859 (D.C.Cir. 1976); *see also Arvizu,* 534 U.S. at 274, 122 S.Ct. at 750–51, 151 L.Ed.2d at 749–50 (totality-of-the-circumstances review "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person' ") (citation omitted).

The evidence justifying the stop need not rise to the level of probable cause. *Scott,* 409 N.W.2d at 468. An officer may make an investigatory stop with "considerably less than proof of wrongdoing by a preponderance of the evidence." *State v. Richardson,* 501 N.W.2d 495, 496–97 (Iowa 1993) (quoting *United States v.*

*Sokolow,* 490 U.S. 1, 8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1, 10 (1989)); *see also Wardlow,* 528 U.S. at 123, 120 S.Ct. at 675–76, 145 L.Ed.2d at 576 (" '[R]easonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence . . . ."); *accord Arvizu,* 534 U.S. at 273, 122 S.Ct. at 751, 151 L.Ed.2d at 750. As one treatise writer suggests, the reference in *Terry* to a reasonable belief "that criminal activity *may* be afoot" suggests that "it will suffice that there exists at the time of the stop a substantial possibility that criminal conduct has occurred, is occurring, or is about to occur." 4 Wayne R. LaFave, *Search and Seizure* § 9.4(b), at 146 (3d ed.1996) [hereinafter LaFave].

Moreover, "reasonable cause may exist to investigate conduct which is subject to a legitimate explanation and turns out to be wholly lawful." *Richardson,* 501 N.W.2d at 497. "The principal function of an investigatory stop is to resolve the ambiguity as to whether criminal activity is afoot." *Id.* As one court aptly put it:

Clearly, the officers were not required to rule out all possibility of innocent behavior before initiating a brief stop and request for identification. The test is founded suspicion. . . . Even if it was equally probable that the vehicle or its occupants were innocent of any wrongdoing, police officers must be permitted to act *before* their reasonable belief is verified by escape or fruition of the harm it was their duty to prevent.

*United States v. Holland,* 510 F.2d 453, 455 (9th Cir.1975) (footnote omitted). A good test of such a founded suspicion is that "the possibility of criminal conduct was strong enough that, upon an objective appraisal of the situation, we would be critical of the officers had they let the event pass without investigation." LaFave

§ 9.4(b), at 148; *see also Olson v. State,* 698 P.2d 107, 111 (Wyo.1985) (held stop was proper where "[i]f the driving pattern of this car had continued, resulting in a highway fatality, society would be understandably shocked if the patrolman, under these circumstances, had not investigated these reports"). In short,

> [t]he Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause for arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate course.

*Adams v. Williams,* 407 U.S. 143, 145, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612, 616–17 (1972).

One of the most common situations in which investigatory stops occur is direct police observation of suspicious conduct. LaFave § 9.4(f), at 176. More relevant to this case is the suspicious conduct of flight at the approach of police officers. The difficult question here is whether such flight in and of itself justifies an investigatory stop. *Id.* § 9.4(f), at 179. Some courts hold it does. *See, e.g., State v. Anderson,* 155 Wis.2d 77, 454 N.W.2d 763, 765 (1990). The rationale for such a holding is found in this passage of *Anderson:*

> [P]olice officers are not required to rule out the possibility of innocent behavior before initiating a brief stop.... [S]uspicious conduct by its very nature is ambiguous, and the principle function of the investigative stop is to quickly resolve that ambiguity. Therefore, if any reasonable inference of wrongful conduct can be objectively discerned, notwithstanding the existence of other innocent inferences that could be drawn, the officers have the right to temporarily detain the individual for the purpose of inquiry.
>
> Flight at the sight of police is undeniably suspicious behavior. Although many innocent explanations could be hypothesized as the reason for the flight, a reasonable police officer who is charged with enforcing the law as well as maintaining peace and order cannot ignore the inference that criminal activity may well be afoot. Although it does not rise to a level of probable cause, flight at the sight of a police officer certainly gives rise to a reasonable suspicion that all is not well. Under these circumstances, "[i]t would have been poor police work indeed for an officer ... to have failed to investigate this behavior further."

*Id.* at 766 (quoting *Terry,* 392 U.S. at 23, 88 S.Ct. at 1881, 20 L.Ed.2d at 907) (other citations omitted).

Other courts hold that flight at the sight of the police does not in and of itself justify an investigatory stop. Rather, such courts require some independently suspicious circumstance to corroborate the inference of a guilty conscience associated with flight at the sight of the police. *See, e.g. State v. Hicks,* 241 Neb. 357, 488 N.W.2d 359, 363–65 (1992). The rationale for such a holding is two-fold. One rationale is that

> allowing flight alone to justify an investigative stop would undercut the very values *Terry* sought to safeguard. *Terry* is based in part upon the proposition that the right to freedom from arbitrary governmental intrusion is as valuable on the street as it is in the home. Thus, while a police officer does not violate the Fourth Amendment by approaching an individual in a public place and asking if the person will answer some questions, neither is the person under any obligation to answer. The person may decline to listen to the questions at all and simply go on his or her way. If the

option to "move on" is chosen, the person "may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds."

*Id.* at 363 (quoting *Florida v. Royer*, 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229, 236 (1983)).

The other rationale is that

an intense desire to avoid contact with the police [is not] necessarily indicative of a guilty conscience. Fear or dislike of authority, distaste for police officers based upon past experience, exaggerated fears of police brutality or harassment, and fear of unjust arrest are all legitimate motivations for avoiding the police.

*Id.* at 364.

 For flight to constitute grounds for suspicion, the circumstances surrounding the suspect's efforts to avoid the police must be such as to allow a rational conclusion that flight indicated a consciousness of guilt. *Smith v. United States*, 558 A.2d 312, 316 (D.C.1989). Such a conclusion can only be drawn if there is evidence permitting a reasonable inference that (1) the suspect knew the police were present and (2) the police believed that the suspect was aware of police presence. *Id.* at 316–17. Thus, the key is that the relationship between the police presence and the suspect's flight was *causal* rather than *coincidental. See United States v. Amuny*, 767 F.2d 1113, 1124 (5th Cir.1985) ("[I]f a police officer identifies himself while approaching a suspect and the suspect flees, the suspect's conduct suggests that he knowingly seeks to evade questioning or capture."); *see also United States v. Jones*, 619 F.2d 494, 498 (5th Cir.1980). As the court in *Jones* appropriately reasoned:

Jones's evasive actions and flight from two strange men riding in an unmarked car and exhibiting no indicia of lawful authority were only natural reactions to the circumstances. While a person's flight from law enforcement officers may be a fact used to support an officer's reasonable suspicion that criminal activity is afoot, here Deputy Herrington had no reason to suspect that Jones was consciously trying to evade a law enforcement officer. Jones's comment to Harrington about trying to avoid contact with the police plainly cannot serve as one of the circumstantial facts from which the presence of reasonable suspicion is to be determined. If, in truth, that was Jones's state of mind during the chase that led to his arrest, it was never communicated to Herrington, and Herrington, being in plain clothes and not having identified himself, could not reasonably have concluded that Jones knew that he was being pursued by a policeman. The initial stop was illegal. . . .

619 F.2d at 498 (citations omitted).

In *Wardlow*, the United States Supreme Court addressed the issue of flight in the context of a *Terry* stop. A four-car caravan converged on an area in Chicago known for heavy narcotics dealing to investigate drug transactions. *Wardlow*, 528 U.S. at 121, 120 S.Ct. at 674, 145 L.Ed.2d at 574. A police officer in the last car of the caravan saw the defendant look in the officer's direction and then run away. *Id.* at 121, 120 S.Ct. at 674–75, 145 L.Ed.2d at 575. The defendant ran through a gangway and an alley. *Id.* at 122, 120 S.Ct. at 675, 145 L.Ed.2d at 575. Eventually, the police cornered him on a street whereupon they stopped and frisked him. *Id.* During the frisk, the police discovered a handgun in a bag the defendant was carrying. *Id.* The trial court denied the defendant's motion to suppress the handgun, and eventually the defendant

was convicted of unlawful use of a weapon by a felon. *Id.* However, the appellate court and the state supreme court concluded the police acted without reasonable suspicion. *Id.* In a 5–4 decision, the United States Supreme Court concluded otherwise. *Id.* at 123, 120 S.Ct. at 675, 145 L.Ed.2d at 575.

The Court first noted that the states were split on whether unprovoked flight alone is sufficient grounds to constitute reasonable suspicion. *Id.* at 123 n. 1, 120 S.Ct. at 675 n. 1, 145 L.Ed.2d at 575 n. 1. The State of Illinois argued for a "bright-line" rule authorizing the temporary detention of anyone who flees at the mere sight of a police officer. *Id.* at 126, 120 S.Ct. at 677, 145 L.Ed.2d at 578 (Stevens, J., dissenting). Rather than accepting the State's argument of a per se rule, the Court concluded that the location of the suspect—in a high-crime area—together with his flight collectively amounted to reasonable suspicion to justify the police "in suspecting that Wardlow was involved in criminal activity, and, therefore in investigating further." *Id.* at 125, 120 S.Ct. at 676, 145 L.Ed.2d at 577.

In the course of its discussion, the Court acknowledged that an "individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Id.* at 124, 120 S.Ct. at 676, 145 L.Ed.2d at 576. On the other hand, the Court recognized "the fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis." *Id.* (citation omitted). The Court then noted that in this case the officer's suspicion was based on more than the suspect's presence in "an area of heavy narcotics trafficking." *Id.* It was also based on Wardlow's "unprovoked flight *upon noticing the police.*" *Id.* (emphasis added). On this point, the Court pointed to previous cases in which it recognized that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Id.* It then stated that Wardlow's conduct,

> [h]eadlong flight—whenever it occurs— is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such. In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior.

*Id.* at 124–25, 120 S.Ct. at 676, 145 L.Ed.2d at 576–77.

The Court considered its discussion about flight as consistent with its prior holding in *Royer.* In that case, the Court held that when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business, without such refusal furnishing objective justification for a detention or seizure. *Id.* at 125, 120 S.Ct. at 676, 145 L.Ed.2d at 577 (citing *Royer,* 460 U.S. at 498, 103 S.Ct. at 1324, 75 L.Ed.2d at 236). Explaining the consistency, the Court stated:

> But unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not "going about one's business"; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or

to stay put and remain silent in the face of police questioning.

*Id.*

Responding to Wardlow's contention that "there are innocent reasons for flight from police and that, therefore, flight is not necessarily indicative of ongoing criminal activity," the Court agreed but noted that this fact

> does not establish a violation of the Fourth Amendment. Even in *Terry,* the conduct justifying the stop was ambiguous and susceptible of an innocent explanation ... but it also suggested [planning of illegal activity]. *Terry* recognized that the officers could detain the individuals to resolve the ambiguity.

*Id.* at 125, 120 S.Ct. at 677, 145 L.Ed.2d at 577; *see also Arvizu,* 534 U.S. at 277, 122 S.Ct. at 753, 151 L.Ed.2d at 752 (determination that reasonable suspicion for an investigatory stop exists need not rule out the possibility of innocent conduct; a number of factors that could be considered innocent could collectively amount to reasonable suspicion); *United States v. Gordon,* 231 F.3d 750, 754 (11th Cir.2000) ("A reasonable suspicion of criminal activity may be formed by observing exclusively legal activity.").

Other suspicious conduct that courts have considered pertinent in determining whether an investigatory stop was justified includes a driver taking evasive action upon being followed by a marked police car, *see State v. Petrick,* 527 N.W.2d 87, 89 (Minn.1995), and a driver jumping from a car and running when police vehicle was close behind, *see United States v. Wilson,* 2 F.3d 226, 231 (7th Cir.1993).

Time of day is yet another factor that courts properly consider together with other suspicious circumstances in determining whether there are grounds for an investigatory stop. LaFave § 9.4(f), at 186–87; *see also United States v. Lender,* 985 F.2d

151, 154 (4th Cir.1993) ("The lateness of the hour is another fact that may raise the level of suspicion."); *Richardson,* 501 N.W.2d at 496 (holding there were sufficient grounds for investigatory stop where, among other suspicious circumstances, deputy sheriff in a marked patrol car observed a car parked next to a chain link fence in a nonresidential area where there were no legitimate attractions at 12:40 a.m. when all surrounding businesses were closed; deputy knew this area had frequently been burglarized; deputy observed what he considered to be deliberative furtive actions when the defendant pulled out just as the officer completed his U-turn and began approaching the defendant); *State v. Donnell,* 239 N.W.2d 575, 578 (Iowa 1976) (sufficient grounds for investigatory stop where an unfamiliar van which could be used to transport furniture was observed repeatedly driving slowly in small town that had suffered a rash of burglaries, and observation was at 2 a.m., "a time when most persons in a residential area would be asleep"); *Commonwealth v. Stratton,* 231 Pa.Super.Ct. 91, 331 A.2d 741, 742 (1974) (facts justifying investigatory stop included defendant's presence at 12:08 a.m. in doorway of store that was closed and his leaving quickly at sight of approaching police officer).

██ The fact that a pursuing police officer does not have reasonable suspicions concerning every occupant of the vehicle being pursued does not render the investigatory stop invalid. *United States v. Martinez,* 808 F.2d 1050, 1054 (5th Cir.1987); *People v. H.J.,* 931 P.2d 1177, 1181 (Colo. 1997) ("While the stopping of the vehicle in a practical sense impacts all of the occupants, the officer need not initially have a reasonable suspicion as to all occupants."). On this point, the court in *H.J.* reasoned:

Occupants of a car differ from, for example customers in a store or passengers on a public bus. Occupants of a private vehicle are [traveling] together by choice and thus may be assumed to have some personal or business association with one another. Knowledge or suspicion that one of the occupants has been involved in criminal activity occurring within the car, or involving the car itself, serves as a basis for a reasonable suspicion that the other occupants may be participants in that activity.

*Id.* at 1182; *see also United States v. Silva,* 957 F.2d 157, 161 (5th Cir.1992) ("We agree ... that a suspect's companionship with or propinquity to an individual independently suspected of criminal activity is a factor to be considered in assessing the reasonableness of a seizure."); *Lewis,* 504 S.E.2d at 734 (investigatory stop justified as to driver on following facts: defendant and male passenger in vehicle had just exited abandoned, unlit development known for drug trafficking, late at night; driver tried to evade approaching police vehicle; defendant's vehicle had New Jersey license plates; defendant stopped in front of known drug house; as police were pulling in behind defendant's vehicle, police activated their vehicle's blue light and passenger at same time jumped out and walked away into the yard, distancing himself from the police).

### V. Analysis.

With these principles in mind, we turn to the record in this case. We must determine whether there were specific and articulable facts, which taken together with rational inferences from those facts afforded Officer Johnson reasonable suspicion that at the time of the stop a substantial possibility existed that criminal conduct had occurred, was occurring, or was about to occur. In making that determination, we consider the circumstances under which the stop was made in light of the totality of the circumstances confronting Officer Johnson, including all information available to the officer at the time he made the decision to stop. We view those circumstances through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training.

The case is close because the record does not indicate that Kreps was violating any traffic laws or was stopped for that purpose. Additionally, there was no evidence of recent criminal activity in the area, and no evidence that Kreps was in a high-crime area. Nevertheless, we think the following combined factors afforded Officer Johnson reasonable suspicion to believe that criminal conduct was "afoot" at the time of the stop.

██ The officer testified he first saw Kreps' vehicle at 2:30 a.m.—normally a time when most people would be asleep. There was no traffic on the street, prompting the officer to turn his vehicle around to "check the vehicle out." From the evidence we can reasonably infer the officer was in a marked car. We note there was a curfew in Carter Lake that prohibited individuals under eighteen from being out past 11 p.m.—a circumstance that would lead a reasonable police officer to suspect that persons in the vehicle he was following might be violating the curfew law.

As the officer caught up to the vehicle, it sped up. The officer continued to follow, at which point the vehicle sped up even more. At this point, it appeared to the officer that the vehicle was attempting to lose him in sort of a cat-and-mouse game and he had a difficult time catching up to it. At times, the vehicle was turning corners "relatively faster than normal traffic does." Eventually, the vehicle made a complete circle. All of these factors smack

of evasive action and would support a reasonable inference that would allow a reasonable police officer to believe that the occupants were aware of a police vehicle following them. Although these facts do not in themselves suggest reasonable suspicion to support an investigatory stop, there is more.

About fifty yards from the point where the vehicle eventually pulled over to the curb and stopped, the passenger exited the vehicle while it was still moving and ran from the vehicle in between houses. At the point where the vehicle stopped, the officer activated his red lights.

Certainly, the passenger's action could be described as headlong flight—"the consummate act of evasion"—provoked by the presence of a police vehicle and therefore suggestive of some wrongdoing. To us the act of the passenger is the "clincher." Adding this to all that went on before, we can truly say that the possibility of criminal conduct was strong enough that we would be critical of Officer Johnson had he let the event pass without investigation.

The fact that it was the passenger rather than the driver who fled does not change our conclusion. As the foregoing cited authority suggests, the fact that Officer Johnson did not have reasonable suspicion concerning every occupant of the vehicle he was following does not render his investigatory stop invalid. Because Officer Johnson had reason to suspect that the passenger was involved in criminal activity occurring within the car, or involving the car itself, such fact serves as a basis for a reasonable suspicion that the driver—Kreps—may have been a participant in that activity. At this point, the Fourth Amendment did not require Officer Johnson to merely "shrug his shoulders" and let criminal conduct occur or a criminal to escape. He was allowed to take the inter-mediate course—stop, investigate, and resolve the ambiguity.

Because Officer Johnson had reasonable grounds to stop Kreps' vehicle, the officer was in a place he had a right to be when he smelled the odor of alcohol coming from Kreps' vehicle and when he noticed Kreps' condition, all of which triggered the subsequent events. *See Donnell,* 239 N.W.2d at 577 ("A vehicle investigatory stop complying with the *Terry* standards may include observing anything to be seen from outside the vehicle.").

## VI. Disposition.

In sum, we conclude Officer Johnson had reasonable cause to stop Kreps' vehicle. We therefore vacate the court of appeals' decision and reverse the district court judgment to the contrary. We remand for further proceedings consistent with this opinion.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**