# IN THE COURT OF APPEALS OF IOWA

No. 24-1847
Filed December 3, 2025

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**CASSIDY JO POAGE,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Jesse Ramirez, Judge.

        A defendant appeals her convictions for three counts of possession of a controlled substance, second offense, challenging the district court's denial of her motion to suppress. **AFFIRMED.**

        Martha J. Lucey, State Appellate Defender, and Allison Linafelter (argued), Assistant Appellate Defender, for appellant.

        Brenna Bird, Attorney General, and Louis S. Sloven (argued), Assistant Attorney General, for appellee.

        Heard at oral argument by Tabor, C.J., and Greer, Schumacher, Badding, and Langholz, JJ.

**LANGHOLZ, Judge.**

To be a reasonable seizure under our state and federal constitutions, a routine traffic stop cannot be extended to wait for a K-9 unit to arrive and conduct an open-air drug sniff unless officers have reasonable suspicion that the stopped vehicle contains illegal drugs. Here, the investigating officer received a report that a red truck had been idling in a suburban driveway for thirty minutes in the wee hours of the morning while people went back and forth between the truck and the house. He knew that the house had prior drug activity because he had responded to a drug overdose there a couple of months before and had seen drug paraphernalia. Other officers had found a high quantity of illegal drugs at the house and, just the day before, had stopped the house's owner and found drugs in his vehicle. As the investigating officer drove to the house, he spotted a red truck—the only vehicle around—driving away from the cul-de-sac where it had been reported. And on stopping the vehicle for a window-tint violation, he immediately saw that the passenger of the truck—Cassidy Poage—had signs of drug use and impairment: pinpoint pupils, ptosis, sores on her face, and burn marks on her lips.

Poage argues that these circumstances did not give reasonable suspicion of illegal drugs in the truck that would justify extending the traffic stop to wait for the K-9 unit. And so, she claims that the district court erred in denying her motion to suppress the drugs that were found after the open-air drug sniff. But on our de novo review, we agree with the district court. This information known by the officers provided reasonable suspicion that justified extending the traffic stop under the Fourth Amendment and article I, section 8, of the Iowa Constitution. We thus affirm the district court's denial of the motion to suppress and Poage's convictions.

I.

At about 1:45 a.m., one morning in June 2024, the Johnston Police Department received a call from a concerned neighbor reporting a suspicious red truck parked in the driveway of a nearby house on a residential cul-de-sac. The caller said that people had been going back and forth between the idling truck and the house for the past thirty minutes or so. A detective passed on this information to a police sergeant, who immediately headed from the police department toward the house where the truck was reported—about a ten- or fifteen-minute drive.

The sergeant recognized the address of the house where the truck was reported to be parked. A few months before, he had responded to an opioid overdose at the same house. While in the house, he noticed "several pieces of burnt foil" in plain view—consistent with the inhalation of illegal drugs. And based on what was seen during that response, other police detectives secured a search warrant for the house. The resulting search found large quantities of narcotics at the house—illegal medications, non-prescribed medications, cocaine, and counterfeit oxycodone pills pressed with fentanyl, known as "M-30s." Plus, the day before the call from the concerned neighbor about the idling red truck, other officers had stopped the owner of the house in his vehicle—finding another M-30 and cocaine residue.

By the time that the sergeant got to the house again on that early June morning, the red truck had left the driveway. But he saw a red truck turning from the house's cul-de-sac onto a connecting street. There was no other traffic around. And from previous patrols of the area, the sergeant knew there were only two other people who regularly drive around the neighborhood at that time. So he was

confident that it was the same red truck reported by the concerned neighbor. As the truck passed the sergeant, he noticed that the truck had dark enough tint on the windows that he "couldn't see through the driver's window."

The sergeant decided to make a traffic stop of the red truck based on his observation of the window-tint traffic violation. *See* Iowa Code §§ 321.438(2), 321.482 (2024). He also planned to investigate his suspicions that those in the truck possessed illegal drugs. So he turned around, caught back up to the truck, and followed behind while running the license plate "just to see who [he] would be dealing with." Then at 2:02 a.m., he stopped the truck on the side of a busier highway and immediately requested a K-9 unit come to the scene. The stop was all captured on video by the sergeant's bodycam.

The sergeant approached the truck on the passenger side and knocked on the window. A woman, later identified as Poage, was seated in the passenger seat and rolled down the window. The sergeant informed the driver and Poage he was stopping them for their tinted windows and asked for their driver's licenses, insurance, and registration. The sergeant stood at the window and spoke with the driver and Poage for about two and a half minutes while they looked for and gave the sergeant the requested items. Throughout most of this time, the sergeant shined his flashlight through the open window, illuminating Poage's face right in front of him. And they spoke with each other briefly. During these first few minutes at her window, the sergeant "noticed that she had pinpoint pupils, she had ptosis, which is involuntary drooping of the eyelids, appeared to have burn marks on her lips" and "had some sores on her face." He knew from his training and experience

that these were all indicators of illegal drug use and that the pinpoint pupils and ptosis were signs of being under the influence of an opiate.

Once the driver and Poage had given the sergeant all the documents—about three minutes into the stop—he returned to his squad car while another officer stayed by the truck. He ran checks on the driver's licenses, completed his normal traffic stop report, and printed out a warning for the window-tint violation. At one point while working on this paperwork, another officer checked in with him and the sergeant explained that the truck "came from a house that [was] known to be dealing some fentanyl." In all, the paperwork took another seven minutes.

The sergeant then grabbed the equipment to test the window tint from his trunk and walked up to the driver's side door to perform the test. The test confirmed the tint was illegal. After briefly returning to the squad car to put the equipment away and get the printed warning, the sergeant asked the driver to step out of the truck. While they were both standing behind the truck, the sergeant explained the warning and returned the driver's license and registration.

About thirteen minutes into the stop, the sergeant told the driver, "alright, well, you're free to go" and asked if the driver had any questions. When the driver did not, the sergeant again said, "like I said, you're free to go," but then started asking the driver a series of questions about why the driver was in Johnston, whether he had anything in the vehicle he was "not supposed to have," and whether he would consent to the sergeant searching the truck.

Just as the driver declined to give consent, the K-9 unit arrived. The drug dog conducted an open-air drug sniff and alerted to the presence of narcotics in the truck. The sergeant then searched the truck, finding illegal drugs and drug

paraphernalia. He found a glass vile in the center console with "a residual white substance" that he "believe[d] at the time to be cocaine." In a purse left where Poage had been sitting, he found "approximately 14 items of paraphernalia" consisting of "glass smoking pipes, residue, a small one-gram baggy of suspected cocaine." And outside the passenger door was "another glass vile with a cork top" with about a quarter gram of what he "suspect[ed], to be methamphetamine within." Drugs were also later found on Poage's person, including a container of 14 grams of suspected cocaine and a "small baggy with a brown substance in it, suspected to be heroin."

Poage was eventually charged with three counts of possession of a controlled substance, second offense—an aggravated misdemeanor—for possessing heroin, cocaine, and methamphetamine. *See* Iowa Code § 124.401(5). And she was charged with two simple misdemeanors—possession of drug paraphernalia and interference with official acts. *See id.* §§ 124.414, 719.1(1)(b).

Poage soon moved to suppress the evidence obtained from the traffic stop, arguing that she was unreasonably seized in violation of the state and federal constitutions because the traffic stop was illegally extended to wait for the K-9 unit to arrive without reasonable suspicion. At the suppression hearing, the State called the sergeant who conducted the traffic stop and another detective who came to the scene of the traffic stop later and had been involved in other earlier investigations related to the house where the red truck was reported. It also introduced the sergeant's bodycam video into evidence.

The district court denied Poage's motion to suppress. The court agreed with Poage that the traffic stop had been extended beyond its window-tint-investigation purpose. But the court concluded that the extension was justified by reasonable suspicion that the vehicle contained drugs, reasoning:

> Officers had knowledge of numerous drug-related activities to the location the vehicle has just left. Officers had knowledge that the owner of the vehicle was involved with drug-related activity. Officers had received information contemporaneous with the stop that the vehicle was sitting in the driveway of [the house] in the early morning hours with people coming and going from the vehicle. This information was at least minimally [corroborated] by Sgt. Johnston when he discovered the red pickup truck leaving the area. Sgt. Johnston also had particularized training and experience with drug-related activities and observed Poage's visual cues of recent drug use and prolonged abuse. Taken together, this court finds the State has met its burden; officers had the requisite reasonable suspicion to prolong the stop in order to carry out the K-9 open air sniff.

After unsuccessfully seeking interlocutory review of the court's suppression ruling, *see State v. Poage*, No. 24-1755 (Iowa Oct. 30, 2024), Poage waived her right to a jury trial and stipulated to a trial on the minutes of testimony. The district court convicted her as charged on all five misdemeanors. And the court imposed consecutive two-year suspended sentences on each of the three aggravated misdemeanors and placed Poage on probation for two years.

Poage now appeals the three aggravated-misdemeanor convictions, challenging only the district court's denial of her motion to suppress.

II.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. So too does article I, section 8 of the Iowa Constitution. *See* Iowa Const. art. I, § 8 ("The right of the people to be secure in

their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated . . . .").  A traffic stop is a seizure of the driver and any passengers that is protected by both provisions.  *See State v. Kreps*, 650 N.W.2d 636, 640–41 (Iowa 2002).  Poage thus had a state and federal constitutional right that her seizure be reasonable.[1]  *See id.*

Poage does not challenge the constitutionality of the initial traffic stop—she concedes the sergeant "had probable cause to stop the truck for a window tint violation."  *See State v. Harrison*, 846 N.W.2d 362, 365 (Iowa 2014) ("When a peace officer observes a traffic offense, however minor, the officer has probable cause to stop the driver of the vehicle." (cleaned up)).  Instead, she argues that the sergeant "unreasonably extended the traffic stop to allow a drug dog to perform an open-air sniff" without the required reasonable suspicion that the truck contained drugs.  *See State v. Arrieta*, 998 N.W.2d 617, 620 (Iowa 2023) ("As a general matter, unless an officer has reasonable suspicion that a vehicle contains drugs, an officer who otherwise lawfully stops a vehicle cannot detain the vehicle beyond the purpose for the stop to conduct a drug dog sniff."); *Rodriguez v. United States*, 575 U.S. 348, 354–57 (2015).  And as with the constitutionality of the initial stop, the parties agree that the sergeant extended the initial traffic stop.[2]  So too do they

---

[1] Poage "does not advance a distinct analytical framework" for her claim under article I, section 8, of the Iowa Constitution.  *State v. Baker*, 925 N.W.2d 602, 610 (Iowa 2019).  We thus analyze both constitutional claims together, applying the Fourth Amendment framework to that state constitutional claim as well.  *See id.*

[2] On appeal, Poage frames the sergeant's extension of the stop as two-fold—purposefully delaying the stop and continuing his questioning after telling the driver that he was "free to go."  Because the parties agree that the stop was extended, we do not decide precisely when and how it was extended except to note that even Poage does not argue any extension had yet occurred when the sergeant first observed her at the passenger-side window during the stop's initial three minutes.

agree that this extension was only constitutional if it was supported by reasonable suspicion that there were drugs in the truck. *See id.*

But there, the agreement ends—and our work begins. We must decide whether—as the district court found—reasonable suspicion existed that illegal drugs were in the truck. We review the district court's decision de novo, independently evaluating "the totality of the circumstances as shown by the entire record." *Arrieta*, 998 N.W.2d at 620 (cleaned up). While we are not bound by the district court's factual findings, we give them deference. *See id.*

Reasonable suspicion exists when officers have "specific and articulable facts, which taken together with rational inferences from those facts" lead the officers "to reasonably believe criminal activity may have occurred." *Id.* at 626 (cleaned up). This "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Kreps*, 650 N.W.2d at 642 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). As our supreme court has explained:

> Officers need not rule out all possibility of innocent behavior because the test is founded suspicion. Even if it was equally probable that the vehicle or its occupants were innocent of any wrongdoing, police officers must be permitted to act *before* their reasonable belief is verified by escape or fruition of the harm it was their duty to prevent.

*State v. Price-Williams*, 973 N.W.2d 556, 562 (Iowa 2022) (cleaned up). "But an officer's mere suspicion, curiosity, or hunch of criminal activity is not enough." *Arrieta*, 998 N.W.2d at 626 (cleaned up). "[W]e do not evaluate reasonable suspicion based on each circumstance individually, but determine the existence of reasonable suspicion by considering all the circumstances together." *State v. McIver*, 858 N.W.2d 699, 702 (Iowa 2015). And "where law enforcement

authorities are cooperating in an investigation," we are not limited to the circumstances known personally by the detaining officer because "the knowledge of one is presumed shared by all." *State v. Schubert*, 346 N.W.2d 30, 32 (Iowa 1984) (cleaned up). So we objectively analyze all the facts confronting the officers—regardless of the detaining officer's "real reasons" or those "stated by the . . . officer in justifying" the seizure. *Kreps*, 650 N.W.2d at 641.

On our de novo review of the totality of the circumstances known by the sergeant and the other officers cooperating in the drug investigation, we agree with the district court that reasonable suspicion existed that illegal drugs were in the truck. For starters, the sergeant received a report that a red truck had been idling in a suburban driveway from about 1:15 a.m. to 1:45 a.m. while people went back and forth between the truck and the house. Both the timing in the wee hours of the morning and the unusual nature of people repeatedly going back and forth between the house and the truck for thirty minutes lends support to a reasonable suspicion that the occupants of the red truck were involved in some sort of drug-dealing activity. *See State v. Donnell*, 239 N.W.2d 575, 578 (Iowa 1976) (recognizing suspicious nature of a van "being driven very slowly" through "three separate residential areas" when it "occurred at 2:00 A.M., a time when most persons in a residential area would be asleep").

What's more, the sergeant knew that the house where the truck was idling had prior drug activity because he had responded to an opioid overdose there a couple of months before. While in the house for that overdose, he noticed drug paraphernalia—"several pieces of burnt foil" that were consistent with inhaling illegal drugs. Indeed, he told another officer at the scene of the traffic stop that the

truck "came from a house that [was] known to be dealing some fentanyl." And the cooperating investigative officers also knew that many drugs had been found at that house and the owner of the house had been stopped just the day before with drugs in his truck. Knowledge that the truck's suspicious conduct was at a residence where prior drug activity had occurred—while not alone sufficient to establish reasonable suspicion—further supports it. *See State v. Snow*, No. 15-0929, 2016 WL 4801353, at *3 (Iowa Ct. App. Sept. 14, 2016) (collecting cases); *see also Wardlow*, 528 U.S. at 124 (explaining that while "presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime," "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation" (cleaned up)).

So when the sergeant spotted a red truck driving away from the cul-de-sac where it had been reported—further corroborating the neighbor's report—he may well have had reasonable suspicion to justify stopping the truck for that purpose alone. But we need not rest on only those circumstances. Immediately after stopping the vehicle for the window-tint violation, he approached the passenger side of the truck and saw that Poage had signs of drug use and impairment: pinpoint pupils, ptosis, sores on her face, and burn marks on her lips. The bodycam video showed that the sergeant shined his flashlight directly at her and observed her for nearly two and a half minutes while she and the driver gathered and provided their driver's licenses, insurance information, and truck registration. And he testified at the suppression hearing that he saw these signs of drug use

and impairment during this initial interaction that occurred in the first few minutes of the traffic stop—before Poage contends any delay or extension of the stop beyond its window-tint purpose occurred. These observations further support reasonable suspicion. *See State v. Warren*, 955 N.W.2d 848, 866 (Iowa 2021) (basing a finding of reasonable suspicion to extend a stop in part on the officer noticing "bloodshot, watery eyes and droopy eyelids"); *State v. Niichel*, No. 22-1909, 2023 WL 6620358, at *3 (Iowa Ct. App. Oct. 11, 2023) (reasoning that driver's "dilated pupils" and her vehicle "being in the area of known drug houses" were "specific and articulable facts" giving rise to reasonable suspicion); *cf.* Iowa Code § 124.418 (recognizing "pinpoint pupils" as a symptom of a "drug-related overdose").[3]

In arguing that reasonable suspicion did not exist, Poage makes three main challenges to the district court's ruling. First, to the facts—what the sergeant observed about Poage at the start of the traffic stop. Second, to the law—whether we can consider the knowledge of other officers cooperating in the investigation. And third, to the application of the law to the facts—whether these circumstances amounted to reasonable suspicion under our unpublished precedent.

---

[3] Relying on out-of-state cases, the dissent contends that we cannot consider *any* of these circumstances in deciding whether reasonable suspicion existed to support the extension of the traffic stop past the point that the sergeant falsely told the driver he was "free to go." Under the dissent's theory, the sergeant's tactic essentially wiped the slate clean—requiring him "to articulate separate facts, not discovered before or during the traffic stop, to justify a new detention" because "the sergeant did not act on his suspicion" about the truck containing drugs first. But the sergeant *did* act on his suspicion by calling for the K-9 unit at the start of the traffic stop. And we see no basis in Iowa or federal law for holding that the sergeant's tactic—pretending that the driver was free while still stalling for the K-9 unit to arrive—alters the proper reasonable-suspicion analysis.

Starting with the factual challenge, Poage argues that we should find—contrary to the district court's finding and the sergeant's testimony—that the sergeant did not notice Poage's ptosis and pinpoint pupils in his initial encounter. She instead contends that the sergeant did not do so until an hour later—long after the stop had been extended—when his bodycam video shows him carefully inspecting her eyes. But the bodycam video of the initial two-and-a-half-minute encounter does not contradict the sergeant's testimony that he noticed these signs of impairment at that time. Rather, it supports it by showing the extended time that he was looking directly at Poage's face with a light shining on her. That he did a more obvious inspection later after Poage was detained and confronted Poage with his findings does not mean that he was lying when he said he first noticed these signs during his initial encounter. Given our deference to the district court—which had the chance to assess his credibility while hearing the sergeant's testimony firsthand—we reject Poage's argument.

Poage next contends that we can only consider the information known personally by the sergeant—and not the additional information known about the house and its owner by the other officers cooperating in the drug investigation. In her view, the shared-knowledge doctrine cannot apply here because of ambiguity in the evidence about precisely what facts other officers told the sergeant before he extended the stop and what facts were known by the officer who ordered the sergeant to investigate the red truck. But Poage's conception of the shared knowledge doctrine is too narrow. It matters not what was "*personally* known of the alleged criminal activity"—"where law enforcement authorities are cooperating in an investigation, the knowledge of one is presumed shared by all." *Schubert*,

346 N.W.2d at 32 (cleaned up).  To be sure, the doctrine does apply to permit "one officer with knowledge about criminal activity to order another officer to act on that knowledge," in which case a court would focus on what the ordering officer knew. *State v. Brown*, 16 N.W.3d 484, 488 (Iowa 2025).  But it also "permits one officer to [act] without knowledge of all of the predicate elements to support [the act] as long as other officers involved have the predicate knowledge."  *Rife v. D.T. Corner, Inc.*, 641 N.W.2d 761, 770 (Iowa 2002) (applying shared-knowledge doctrine in the analogous context of authority to make a warrantless citizen's arrest based on the knowledge of others "acting in concert" and without any testimony from the person making the detention).  Here, the sergeant was cooperating with other officers involved in the investigation of the drug house and the red truck, so we may consider the facts known by any of them in assessing reasonable suspicion regardless of whether the facts were told to the sergeant before extending the stop.

Finally, Poage argues that we should follow our unpublished opinion in *State v. Bounmy*, No. 15-2225, 2017 WL 512486 (Iowa Ct. App. Feb. 8, 2017), to hold that reasonable suspicion does not exist here.  There, we held that a deputy sheriff lacked reasonable suspicion to extend a traffic stop beyond its initial purpose when the deputy knew "that a similar vehicle had been seen leaving a 'known drug house'" and the "driver was 'flustered' at times" and "could not recollect exactly where he had been, who he had been visiting at the hospital, or his passenger's last name."  *Id.* at *6.  In doing so, we emphasized that the drug-house information was "unenhanced by the deputies' observations" and distinguished an earlier case where we held that such information plus an officer's

observations "that the driver's pupils were dilated" established reasonable suspicion.  *Id.* at *5 & n.8.

The circumstances here are materially different than *Bounmy*.  Rather than mere presence at a drug house, the sergeant had information that people were going back and forth to the truck for thirty minutes—suggesting that the occupants in the truck were engaged in drug trafficking activity.  And this information was not "unenhanced"—the sergeant also observed Poage's physical condition immediately after the stop and identified signs of drug use and impairment.  So the circumstances here are much more like the case *Bounmy* distinguished than *Bounmy* itself.  *See id.* at *5 n.8.

Bottom line, based on all these circumstances together, reasonable suspicion existed to extend the traffic stop for the K-9 unit to arrive to further investigate potential illegal drugs in the truck.  We thus affirm the district court's denial of the motion suppress and Poage's convictions.

**AFFIRMED.**

Greer, Schumacher, and Badding, JJ., concurs; Tabor, C.J., dissents.

**TABOR, Chief Judge.** (dissenting)

I agree with the majority that law enforcement "may well have had reasonable suspicion to justify stopping" the truck occupied by Bobby Ferris and Cassidy Poage with the aim of drug interdiction. And that Sergeant Johnston's observations of Poage from the passenger window reinforced that basis for the stop. But from there, I respectfully dissent. The constitutional analysis changed when the sergeant told Ferris and Poage that they were free to leave—"a questionable maneuver to employ in the midst of a claimed ongoing investigation." *See State v. Ballard*, 617 N.W.2d 837, 842 (S.D. 2000). "Once officers tell traffic violators they are free to leave with a citation or a warning, the Fourth Amendment intercedes to limit a further detention or search." *Id.*

At the suppression hearing, defense counsel asked the sergeant: "Why did you tell Mr. Ferris he was free to leave if you were going to run a dog around the vehicle anyway?" The answer: "[W]hen I issued the written warning, I advised him he was free to leave because I was going to ask [for a] consensual way to search his vehicle and he has to be free to leave and make a voluntary choice to allow me to search his vehicle." Defense counsel noted: "Which is fair to say he didn't do?" To which the sergeant responded: "Correct."

Complicating his strategy, the sergeant's gamble on garnering consent to search did not pay off. "A refusal to give consent to search after the motorist is free to leave cannot give rise, of itself, to further suspicion and justification for a search; otherwise, the exercise of a Fourth Amendment right would be meaningless." *Id.* In this way, the sergeant's interactions with Ferris and Poage resemble the treatment of the motorist in *Ballard*. *Id.* ("This case presents a close

question on when continued detention becomes unreasonable."). And like the South Dakota Supreme Court, I am "concerned with the dubious message we send to law enforcement officers and the public if we validate a procedure allowing officers to falsely tell traffic offenders they are free to go, only for the purpose of eliciting their uncoerced agreement to search their automobiles." *Id.*

I am not alone in my concern. At oral arguments, the assistant attorney general representing the State acknowledged that he was "not comfortable" with police lying during the course of the investigation yet defended as legal the sergeant's insincere directive to the motorists that they were free to leave. But if the sergeant had reasonable suspicion to prolong the stop, "then he was obligated to act on it before telling [the motorists they] could leave." *See State v. Sweeney*, 227 P.3d 868, 880 (Ariz. Ct. App. 2010) (Brown, J., specially concurring).[4]

---

[4] The special concurrence in *Sweeney* shed light on this "catch and release" investigative technique, 227 P.3d at 876:

> Officer Craft testified that he was trained to follow a procedure similar to that in *Ballard*; specifically, he was trained to issue a warning, release the motorist from the traffic-stop detention, call him back to initiate a consensual encounter, seek consent to sniff or search, and then detain for a sniff and search if consent is declined. This tactic apparently is implemented in an attempt to obtain consent to search the motorist's vehicle without having to rely on reasonable suspicion or probable cause as a basis for the search. While I question the wisdom of such a practice, I am unaware of any current legal impediment to its use. Police officers may engage in certain interrogation practices, including the technique described by Officer Craft. In doing so, however, they run the risk that the individual being investigated will exercise his constitutional right to refuse a search of his vehicle. The officer must then be prepared to justify a second detention based on additional factors not originally discovered during the initial traffic stop.

227 P.3d at 880–81 (Brown, J., specially concurring) (internal citation and footnote omitted).

Because the sergeant did not act on his suspicion that Poage possessed drugs before proclaiming that she was free to go, he had to articulate separate facts, not discovered before or during the traffic stop, to justify a new detention—while awaiting the dog's arrival and during the open-air sniff. *See State v. Beckman*, 305 P.3d 912, 918 (Nev. 2013) (rejecting indicia of drug activity that trooper "observed *before* he decided to issue a warning and send Beckman on his way"); *see also In re Pardee*, 872 N.W.2d 384, 396 (Iowa 2015) (requiring individualized suspicion to justify a dog sniff after trooper told motorists they were "free to go").

When deciding whether the Fourth Amendment permits a prolonged traffic stop, federal courts look for the "*Rodriguez* moment"—the point when reasonable suspicion becomes necessary to continue the detention for an unrelated investigation. *See United States v. Leon*, 80 F.4th 1160, 1165 (10th Cir. 2023) (discussing *Rodriguez v. United States*, 575 U.S. 348 (2015)). The majority declines to identify the *Rodriguez* moment in the investigation of Poage. It figures that because the parties agree the stop was prolonged, we need not "decide precisely when and how it was extended except to note that even Poage does not argue any extension had yet occurred when the sergeant first observed her at the passenger-side window during the stop's initial three minutes." True, those early observations contributed to the reasonable suspicion to detain Poage. But the sergeant did not act on those observations. Instead, he told Poage and Ferris that they could leave with a warning about the truck's tinted windows. The *Rodriguez* moment came when the sergeant—after telling Poage and Ferris that they could leave—asked if there was anything illegal in the truck and sought consent to

search.  Just after Ferris refused consent, the dog arrived.  The sergeant then directed Poage to step out of the truck so the dog could "run around quick." Because the sergeant did not obtain any new indicia of drug activity after ending the initial detention, the renewed detention was impermissible.[5]  *See United States v. Evans*, 122 F. Supp. 3d 1027, 1038 (D. Nev. 2015) ("[O]nce the stop becomes unreasonably prolonged, any purported reasonable suspicion to justify further prolongations must be supported by *new* indicia of criminal activity.").

I would reverse the suppression ruling and remand for further proceedings.

---

[5] "[E]ven de minimis extensions of traffic stops are unacceptable under the Fourth Amendment."  *State v. Arrieta*, 998 N.W.2d 617, 621 (Iowa 2023).