# IN THE SUPREME COURT OF IOWA

No. 19–1614

Submitted September 16, 2020–Filed February 19, 2021

**STATE OF IOWA,**

    Appellee,

vs.

**STEVEN EDWARD STRUVE,**

    Appellant.

---

Appeal from the Iowa District Court for Clinton County, Marlita A. Greve, Judge.

The defendant appeals denial of his motion to suppress, arguing officers lacked reasonable suspicion he was illegally using his cell phone to support a traffic stop. **AFFIRMED.**

Oxley, J., delivered the opinion of the court, in which Waterman, Mansfield, and McDonald, JJ., joined. McDermott, J., filed a dissenting opinion in which Christensen, C.J., and Appel, J., joined. Appel, J., filed a separate dissenting opinion.

Martha J. Lucey, State Appellate Defender, and Vidhya K. Reddy (argued), Assistant Appellate Defendant, for appellant.

Thomas J. Miller, Attorney General, Kyle Hanson (argued), Assistant Attorney General, Mike Wolf, County Attorney, and James M. McHugh, Assistant County Attorney, for appellee.

**OXLEY, Justice.**

Iowa is not a "hands-free" driving state. The Iowa legislature recently expanded Iowa's texting-while-driving[1] statute but stopped short of prohibiting all hands-on use of a cell phone. Instead, Iowa Code section 321.276 allows drivers to use cell phones for some limited purposes while prohibiting most others.

We do not decide today what uses of a cell phone are permitted and what uses are prohibited by section 321.276. The driver here was not charged with violating the statute. He was, however, stopped when officers believed he might be violating it. Thus, this case requires us to determine when a police officer's observations of a driver using a cell phone move from only a "hunch" the driver is using the cell phone in a prohibited manner to providing the "specific and articulable facts" required to permit an officer to stop a driver and investigate whether the use violates Iowa law. For the reasons explained below, we hold that observations of a driver holding a phone in front of his face and actively manipulating the screen for at least ten seconds as involved in this case justified stopping the driver to resolve any ambiguity about whether the driver was violating section 321.276.

## I. Factual Background and Proceedings.

Around 9 p.m. on October 2, 2018, Clinton police officers Curtis Blake and Roger Schumacher were driving next to a vehicle when they observed the driver holding a phone in front of his face. They could see the glow of the phone from their car and that the driver was "manipulating" the screen with his finger. The officers' dash camera recorded the incident. After travelling alongside the car for approximately ten seconds, during

---

[1]We use this term as a colloquial shorthand for the statute with the understanding that it addresses more than texting.

which time the driver continued using the phone, the officers made a traffic stop.

After they pulled him over, the officers recognized the driver of the car as Steven Struve. Struve continued using the cell phone as the officers approached his vehicle. Officer Schumacher spoke to Struve, telling him he was not allowed to text while driving, while Officer Blake spoke to Struve's passenger. Struve responded he thought it was only illegal to text and drive in Illinois and explained he had been showing his passenger photos from his phone's gallery. As Officer Schumacher spoke to Struve, Officer Blake noticed what appeared to be a drug pipe protruding from a bag in the car's backseat. Officer Blake notified Officer Schumacher about the pipe, and they searched the vehicle.

The officers confirmed the pipe was the type used to smoke methamphetamine and ultimately discovered a baggie of over twenty grams of a substance that appeared to be methamphetamine under the center console. The officers arrested Struve and charged him with possession with intent to distribute methamphetamine in excess of five grams, a class "B" felony, and failure to affix a drug stamp. Struve filed a motion to suppress the items discovered during the traffic stop, arguing the officers lacked reasonable suspicion Struve was committing a traffic violation. Without reasonable suspicion, the traffic stop would amount to an unconstitutional seizure, and the fruits of that seizure would be suppressed. The district court denied the motion, concluding the officers had reasonable suspicion to stop Struve under Iowa Code section 321.276.

After a plea agreement was reached, and then withdrawn, the State withdrew the class "B" felony charge and charged Struve with possession with intent to deliver methamphetamine in violation of Iowa Code section 124.401(1)(*c*)(6), a class "C" felony. Struve proceeded to a bench trial on

the minutes of testimony, and the district court found him guilty. Struve appeals the denial of his motion to suppress. On appeal, Struve challenges only the initial stop; he does not challenge the officers' subsequent search of the car after they observed the pipe in the back seat, conducted under the plain-view exception to the warrant requirement.

## II. Standard of Review.

Struve claims the officer's stop amounted to an unreasonable seizure in violation of the Fourth Amendment of the United States Constitution and article I, section 8 of the Iowa Constitution. Given the constitutional basis of his challenge, we review the denial of his motion to suppress de novo. *State v. Tyler*, 830 N.W.2d 288, 291 (Iowa 2013). "We independently evaluate the totality of the circumstances found in the record . . . ." *State v. Vance*, 790 N.W.2d 775, 780 (Iowa 2010). We give deference to the factual findings of the trial court but we are not bound by them. *Id.*; *Tyler*, 830 N.W.2d at 291. The parties do not seriously dispute the underlying facts; rather, they disagree about whether the officers' observations supported the stop.

## III. Analysis.

**A. Reasonable Suspicion to Support an Investigatory Stop.** Struve challenges the officers' stop as an unreasonable warrantless seizure. *See State v. Kreps*, 650 N.W.2d 636, 641 (Iowa 2002). Our focus is on reasonableness, as our jurisprudence—and both constitutions—prohibit only "unreasonable" seizures. *See* U.S. Const. amend. IV; Iowa Const. art. I, § 8. These constitutional protections generally require a warrant before an officer may seize a person, with noted exceptions.

One exception allows an officer to briefly detain a driver to investigate whether a traffic violation has been, or is being, committed, but only if the officer can establish reasonable suspicion for the stop. *Kreps*,

650 N.W.2d at 641. "The purpose of an investigatory stop is to allow a police officer to confirm or dispel suspicions of criminal activity through reasonable questioning." *Id.* Reasonable suspicion to support an investigatory stop requires that the officer identify "specific and articulable facts, which taken together with rational inferences from those facts, to reasonably believe criminal activity may have occurred." *State v. Tague,* 676 N.W.2d 197, 204 (Iowa 2004). "Mere suspicion, curiosity, or hunch of criminal activity is not enough." *Id.*

Yet, police officers need not rule out all possibility of innocent behavior before briefly detaining a driver. *Kreps,* 650 N.W.2d at 641–42. Even if it is equally probable that a driver is innocent, "police officers must be permitted to act *before* their reasonable belief is verified by escape or fruition of the harm it was their duty to prevent." *Id.* at 642 (quoting *United States v. Holland,* 510 F.2d 453, 455 (9th Cir. 1975)). Thus, "reasonable cause may exist to investigate conduct which is subject to a legitimate explanation and turns out to be wholly lawful." *Id.* (quoting *State v. Richardson,* 501 N.W.2d 495, 497 (Iowa 1993) (per curiam)). We "judge[] the facts against an objective standard: 'would the facts available to the officer at the moment of the seizure . . . "warrant a man of reasonable caution in the belief" that the action taken was appropriate?'" *Id.* at 641 (quoting *State v. Heminover,* 619 N.W.2d 353, 357 (Iowa 2000) (en banc), *abrogated on other grounds by State v. Turner,* 630 N.W.2d 601, 606 n.2 (Iowa 2001)).

The United States Supreme Court recently addressed reasonable suspicion in *Kansas v. Glover,* where it held an officer had reasonable suspicion to stop a driver after the officer ran the vehicle's plates and learned the owner's license was revoked. *See* 589 U.S. ___, ___, 140 S. Ct. 1183, 1188 (2020). That fact, coupled with "the commonsense inference

that [the owner] was likely the driver of the vehicle . . . provided more than reasonable suspicion to initiate the stop." *Id.*

In distinguishing between a "mere hunch" that does not create reasonable suspicion and articulable and particularized facts that do, the Court recognized that officers in the field must be allowed to rely on "commonsense judgments and inferences about human behavior" in determining whether the particular facts known to the officer indicate criminal activity sufficient to warrant investigation. *Id.* at \_\_\_, 140 S. Ct at 1187–88 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S. Ct. 673, 676 (2000)).

Justice Kagan concurred, agreeing that the officer could reasonably infer that the driver of a vehicle is likely the owner even if the owner's license has been revoked based on the additional fact that "revocations in Kansas nearly always stem from serious or repeated driving violations," giving additional support to the officer's inference that motorists with revoked licenses continue to drive. *Id.* at \_\_\_, 140 S. Ct at 1194 (Kagan, J., concurring). The majority recognized the Kansas licensing scheme reinforced the reasonableness of the officer's inference, but it was not needed to support the stop; "common sense suffice[d] to justify [the] inference." *Id.* at \_\_\_, 140 S. Ct at 1188–89.

We reached the same conclusion on similar facts ten years earlier. *See Vance*, 790 N.W.2d at 781. An officer had reasonable suspicion to initiate an investigatory stop where the officer knew the registered owner of the vehicle had a suspended license and the officer was "unaware of any evidence or circumstances indicating the registered owner [was] not the driver of the vehicle." *Id.* (addressing a challenge under the Fourth Amendment).

Recognizing that an inference that the owner of a vehicle does most of the driving "may be fallible," we nonetheless concluded it was "sufficiently reasonable to generate reasonable suspicion for an investigatory stop to resolve the ambiguity as to whether criminal activity is afoot." *Id.* at 781–82. Forbidding officers from relying on the commonsense inference that the driver of a vehicle is usually its owner "would seriously limit an officer's ability to investigate suspension violations because there are few, if any, additional steps the officer can utilize to establish the driver of a vehicle is its registered owner." *Id.* at 782.

We rejected the argument that the officer should do more to investigate whether the driver is the suspended owner because it "place[d] too heavy a burden on the police." *Id.* ("It would be impossible for an officer to verify that a driver of a vehicle fits the description of the registered owner in heavy traffic, if the vehicle has darkly tinted windows, or if the stop occurs at night . . . ."). Allowing the officer to rely on the inference without engaging in further investigation "adequately protect[ed] against suspicionless investigatory stops because" if the officer is or becomes aware of facts that invalidate the assumption, such as evidence that the driver appears to be a different age or gender than the registered owner, "reasonable suspicion would, of course, dissipate." *Id.* (second quoting *State v. Newer*, 742 N.W.2d 923, 926 (Wis. Ct. App. 2007)). Our position is consistent with that taken by the Supreme Court in *Glover*. While an officer is not required to look for corroborating facts, "the presence of additional facts might dispel reasonable suspicion." *Glover*, 589 U.S. at ___, 140 S. Ct. at 1191.

We also recognized that allowing an officer to rely on commonsense inferences, "absent any evidence to the contrary, ensures the safety of the

roadways and of law enforcement." *Vance*, 790 N.W.2d at 782. Requiring the officer to verify that the driver met the registered owner's description would endanger both the officer and the traveling public if he had to attempt to maneuver himself into a position to clearly observe the driver. *Id.*

Last year, we applied *Vance* to a challenge under the Iowa constitution and upheld a traffic stop after officers observed a woman and two men leave a residence, ran the vehicle's license plate, and discovered the registered owner was a woman with a suspended license who "appeared to be" the defendant. *See State v. Haas*, 930 N.W.2d 699, 702 (Iowa 2019) (per curiam). The fact that three people got into the car did "not invalidate the officers' assumption that [the registered owner] was driving her own vehicle" where the officers did not see who was driving. *Id.* As in *Glover*, we did not require additional corroboration for the officer's commonsense inference that the owner of a vehicle is likely the driver, even when the owner's license is suspended.

Relying on an officer's common sense is not new to our reasonable suspicion jurisprudence. An officer is expected to make "commonsense judgments and inferences about human behavior" when stopping a motorist engaged in suspicious behavior. *See Kreps*, 650 N.W.2d at 640, 645 (quoting *Wardlow*, 528 U.S. at 124–25, 120 S. Ct. at 676) (concluding stop was supported by reasonable suspicion despite no indication of criminal activity based on defendant's actions of attempting to elude officer without violating any traffic laws, coupled with passenger's jump from vehicle); *see also State v. Lindsey*, 881 N.W.2d 411, 426 (Iowa 2016) (concluding "school officials were operating on a 'common-sense conclusio[n] about human behavior' upon which 'practical people'— including government officials—are entitled to rely" in searching student

athlete's bag with history of gun and drug possession after he expressed unprompted and unusual concern about the bag while lying injured on the football field) (alteration in original) (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 346, 105 S. Ct. 733, 745 (1985)).  Nor does an officer's common sense need to be based on specific training or law enforcement experience. *Glover*, 589 U.S. at ___, 140 S Ct. at 1189 ("The inference that the driver of a car is its registered owner does not require any specialized training; rather, it is a reasonable inference made by ordinary people on a daily basis.").  As the Supreme Court explained, "the 'common sense' understanding of common sense, [is that it refers to] information that is accessible to people generally, not just some specialized subset of society." *Id.* at ___, 140 S. Ct. at 1189–90.  Thus, officers are expected to "draw[] factual inferences based on the commonly held knowledge they have acquired in their everyday lives." *Id.* at ___, 140 S. Ct. at 1190.

The following propositions emerge from these cases.  First, an officer is expected to rely on their common sense and understanding of human behavior in determining whether observed activity raises their suspicions above a "mere hunch" of criminal activity.  The officer's understanding comes not only from their training and experience as an officer but also their understanding from everyday life.  Second, the officer's suspicion need not be infallible or even rise to a fifty-fifty chance the individual is engaged in criminal activity to be reasonable.  Third, an officer is not required to engage in additional investigation to confirm their suspicions as long as the initial suspicions are in fact reasonable.  But if they become aware of additional facts that make their suspicions of illegal activity unreasonable, the reasonableness of the initial suspicion dissipates and they cannot make the stop.

With this framework, we consider the Iowa texting-while-driving statute to put in context whether Struve's use of his cell phone as observed by the officers gave rise to a reasonable suspicion that he was using it in an illegal manner.

**B. Iowa Code Section 321.276's Prohibition on Using Cell Phones While Driving.**

Prior to July 1, 2017, section 321.276 prohibited a driver from using a cell phone "to write, send, or read a text message while driving a motor vehicle unless the motor vehicle [was] at a complete stop off the traveled portion of the roadway." Iowa Code § 321.276(2) (2017). The prohibition extended to text-based messages, instant messages, and email messages. *Id.* § 321.276(1)(*c*). The statute expressly allowed other uses of a cell phone, including using the cell phone's global position system (GPS) or navigation system, selecting a name or entering a number to make a voice call, and "activate[ing], deactivate[ing], or initiate[ing] a function of a hand-held mobile telephone." *Id.* § 321.276(2)(*a*). It also allowed use of cell phones in specific safety-related circumstances. *Id.* § 321.276(2)(*b*). Section 321.276 was a secondary offense, which means an officer could not stop a driver for violating it but could only cite a driver if lawfully stopped for another traffic violation. *See id.* § 321.276(5) ("A peace officer shall not stop or detain a person solely for a suspected violation of this section. This section is enforceable by a peace officer only as a secondary action when the driver of a motor vehicle has been stopped or detained for a suspected violation of another provision of this chapter, a local ordinance equivalent to a provision of this chapter, or other law.").

On April 17, 2017, the legislature passed Senate File 234, titled "An Act relating to the use of electronic communication devices to write, send, or view electronic messages while driving as a primary offense, and making

penalties applicable." 2017 Iowa Acts ch. 75 (codified at Iowa Code § 321.276 (2018)). While the legislature did not enact a "hands-free" law, as some states have done, it did place additional limitations on the use of cell phones while driving. The Act broadened the statute's coverage from "text messages" to "electronic messages," changed its prohibition of "reading" such messages to "viewing" them, redefined relevant terms, and made violations a primary offense so that officers could stop drivers for violating the revised statute. *Id.* §§ 1, 5.

Iowa Code section 321.276 now declares, "A person shall not use a hand-held electronic communication device to write, send, or view an electronic message while driving a motor vehicle unless the motor vehicle is at a complete stop off the traveled portion of the roadway." Iowa Code § 321.276(2) (2018). An "electronic message" expressly "includes images visible on the screen of a hand-held electronic communication device including a text-based message, an instant message, a portion of electronic mail, an internet site, a social media application, or a game." *Id.* § 321.276(1)(*a*). Additionally, the revisions defined "[t]he terms 'write', 'send', and 'view', with respect to an electronic message, [to] mean the manual entry, transmission, or retrieval of an electronic message, and include playing, browsing, or accessing an electronic message." *Id.* § 321.276(1)(*d*). The statute continues to expressly allow use of a cell phone for navigation; to conduct voice calls; to activate, deactivate, or initiate other functions of a cell phone; and in specific safety-related circumstances. *Id.* § 321.276(2)(*a*), (*b*).

The revised statute now broadly prohibits not only texting and emailing but also browsing internet sites, accessing social media apps, and playing games while driving. At oral argument, Struve conceded the statute prohibits a motorist from using a cell phone for any purpose other

than the express exceptions identified in section 321.276(2)(*a*) and subsection (*b*). Struve also concedes that his actions of scrolling through his phone's photo gallery and showing pictures to his passenger violated the statute. The State does not disagree with Struve's interpretation of the statute.

We need not decide the specific contours of the revised statute for purposes of this appeal.[2] It is sufficient for our purposes to recognize that

[2]The dissent's impassioned plea rests on the premise that the legislative revisions did little to change the prohibited uses of a cell phone. The dissent's position is not advanced by either party; indeed, it is at odds with the interpretation actually advanced by both parties. "[O]ur system 'is designed around the premise that [parties represented by competent counsel] know what is best for them, and are responsible for advancing the facts and argument entitling them to relief.' " *United States v. Sineneng-Smith*, 590 U.S. ___, ___, 140 S. Ct. 1575, 1579 (2020) (alteration in original) (quoting *Castro v. United States*, 540 U.S. 375, 386, 124 S. Ct. 786, 794 (2003) (Scalia, J., concurring in part and concurring in judgment)). " '[C]ourts are essentially passive instruments of government.' They 'do not, or should not, sally forth each day looking for wrongs to right. [They] wait for cases to come to [them], and when [cases arise, courts] normally decide only questions presented by the parties.' " *Id.* (alteration in original) (citation omitted) (quoting *United States v. Samuels*, 808 F.2d 1298, 1301 (8th Cir. 1987) (Arnold, J., concurring in denial of reh'g en banc)).

One danger of relying on a position not advocated by either party is that the position remains untested by our adversarial system and its logic may not be thoroughly scrutinized before making its way into an opinion. According to the dissent's research, use of forty of the forty-four preloaded apps on an iPhone is not prohibited by the dissent's reading of section 321.276. From this, the dissent concludes that when a person is using a phone, they are much more likely than not using it for a permissible purpose. This conclusion is based on unsound reasoning. The relevant question is not what percentage of apps can be used without violating the statute. The relevant question is what percentage of time people spend using apps prohibited by the statute. The dissent's analysis assumes all apps are used equally. If a person has only two apps on a phone—a weather app and a text messaging app—there would be a fifty-fifty chance the person is using the weather app or the text messaging app. Of course we know this is not true. This example simply demonstrates the dissent's failure to account for a critical variable in its own analysis.

Relying on positions not advocated by the parties also results in the loss of vetting through consideration of contrary arguments. The dissent surmises that a driver may permissibly use apps on an iPhone to order food, trade stocks, shop for books, and check in for a flight, among others. An argument to the contrary could be made (and might have been made by the State had it been given the opportunity). The dissent points out that the statute provides a nonexhaustive list of examples of what constitutes an "electronic message." The question remains whether an app that allows the cell phone user to communicate with the app's provider is sufficiently similar to communicating through an internet site (expressly listed), such that using the app would also be

the legislature greatly expanded the conduct prohibited by section 321.276. Our resolution of Struve's appeal turns on whether Officer Blake and Officer Schroeder observed activity that justified stopping Struve for the purpose of investigating whether he was engaged in illegal activity.

Before determining whether the officers had reasonable suspicion for the stop, we review cases addressing texting-while-driving statutes from other jurisdictions.

**C. How Other Jurisdictions Have Handled Traffic Stops for Cell Phone Use While Driving.** A handful of courts have addressed Fourth Amendment challenges (or analogous state constitutional challenges) to traffic stops for cell phone use under other states' laws. The different language used in various state statutes limits our ability to apply other cases to Iowa's statute, but a review of their reasoning supports our ultimate conclusion that the officers had reasonable suspicion to stop Struve.

In *United States v. Paniagua-Garcia,* an officer observed a driver holding a cell phone in his right hand with his head bent toward the phone, who "appeared to be texting." 813 F.3d 1013, 1013–14 (7th Cir. 2016). The United States Court of Appeals for the Seventh Circuit focused on the quantity of prohibited and allowed uses to conclude the officer's suspicion the driver was violating Indiana law was not reasonable. *Id.* at 1014–15.

---

prohibited. A cell phone user who downloads and uses Amazon's app to order books communicates with Amazon in virtually the same way as if they used their phone's web browser to access Amazon's website. We make no judgment as to whether browsing or accessing an app instead of an internet site while driving violates section 321.276. We leave that question for another day where the issue is more directly presented through the adversarial process. For this case, it is enough to recognize that the legislature greatly expanded the statute's coverage from its prior limited prohibitions. *Cf. State v. Coleman*, 907 N.W.2d 124, 135–36 (Iowa 2018) ("[A]lthough we adhere to the rule of lenity in criminal cases, criminal statutes still 'must be construed reasonably and in such a way as to not defeat their plain purpose.' " (quoting *State v. Hagen*, 840 N.W.2d 140, 146 (Iowa 2013))).

It turned out the driver was searching for music on his phone, not texting. *Id.* at 1014. Where Indiana's texting-and-driving law prohibited only texting and emailing but allowed "*[a]ll* other uses," including "making and receiving phone calls, inputting addresses, reading driving directions and maps with GPS applications, reading news and weather programs, retrieving and playing music or audio books, surfing the Internet, playing video games—even watching movies or television," the court concluded it was not reasonable to stop someone seen using a cell phone without evidence that the officers saw texting as opposed to activity that is "consistent with any one of a number of lawful uses of cellphones." *Id.* The officer never "explained what created the appearance of texting as distinct from any one of the multiple other—lawful—uses of a cellphone by a driver." *Id.*

We are not persuaded by *Paniagua-Garcia*, which considered a statute prohibiting only texting, much like the prior Iowa statute. When the Iowa legislature changed section 321.276 from a secondary offense to a primary offense, it also greatly expanded the scope of its coverage to prohibit not only writing, sending, or reading text or email messages but also playing games, browsing social media apps, and accessing internet sites. Thus, the revised Iowa statute prohibits much of the activity allowed under the Indiana statute that supported the Seventh Circuit's conclusion.

In *State v. Morsette*, the North Dakota Supreme Court held reasonable suspicion did not support a traffic stop where a police officer "observed a driver in the adjacent lane manipulating his touchscreen cell phone for approximately two seconds" while stopped at a red light. 924 N.W.2d 434, 436 (N.D. 2019). While the North Dakota statute prohibits more conduct than did the Indiana statute at issue in *Paniagua-Garcia*, we decline to follow the lead of the *Morsette* majority because it is contrary

to the Supreme Court's discussion of reasonable suspicion in *Glover*. *Morsette* focused on the lack of evidence about the stopping officer's "past success rate at identifying violations" of the texting-while-driving statute or "any unique training he received" that would enable him to identify allowed use compared to prohibited use while travelling next to a moving vehicle. 924 N.W.2d at 440. But under *Glover*, reasonable suspicion includes common sense derived from everyday life, not only from specialized training or success rates. *See Glover*, 589 U.S. at \_\_\_, 140 S. Ct. at 1189–90 ("Nothing in our Fourth Amendment precedent supports the notion that, in determining whether reasonable suspicion exists, an officer can draw inferences based on knowledge gained only through law enforcement training and experience. We have repeatedly recognized the opposite."). As the Supreme Court explained in *Glover*, requiring an officer to identify specific training to support his suspicions "would also impose on police the burden of pointing to specific training materials or field experiences justifying reasonable suspicion for the myriad infractions in municipal criminal codes." *Id.* at \_\_\_, 140 S. Ct. at 1190.

The chief justice disagreed with the majority in *Morsette*. "[T]hat a person may be using a wireless communications device . . . for a valid purpose does not negate the reasonable suspicion that the person is using the cell phone for a prohibited purpose." *Morsette*, 924 N.W.2d at 441 (VandeWalle, C.J., dissenting). Considering the extent of conduct prohibited by the North Dakota statute, the chief justice concluded "it is as probable that the cell phone is used to send or receive prohibited electronic messages as it is that the device is being used for one of the lawful purposes, perhaps more so." *Id.*

Further, that the statute may be difficult to apply does not preclude officers from stopping drivers when the officer has articulable and objective

facts to support the stop. *See id.* ("It seems to me that the majority opinion substantially reduces, if not eliminates, the effective enforcement of the statute."). The *Morsette* dissent's position is more in line with the concern we identified in *Vance* that requiring an officer to further investigate whether the driver is the suspended owner before making a stop "place[d] too heavy a burden on the police." *Vance*, 790 N.W.2d at 782.

Oregon courts have considered the issue in two cases, finding probable cause[3] in one but not the other. In the first case, the officer observed " 'light coming up to [defendant's] face' that he believed was coming 'from a device that was in her hand that she was looking down at' . . . for approximately 10 seconds." *State v. Rabanales-Ramos*, 359 P.3d 250, 251–52 (Or. Ct. App. 2015) (alteration in original). "The trooper did not see defendant put the device up to her ear, move her lips as if she were talking, or push any buttons." *Id.* Interpreting the statutory text to prohibit only use of a cell phone for communication, but not any other uses, the court concluded the trooper's "belief that defendant had 'use[d]' that device was not objectively reasonable under the circumstances." *Id.* at 256 (alteration in original).

The Oregon Court of Appeals reached the opposite conclusion in *State v. Nguyen Ngoc Pham*, where police officers observed the defendant holding a cell phone in his hand, "saw the screen was lit up . . . and . . . could see [defendant] pushing something on the screen." 433 P.3d 745, 746 (Or. Ct. App. 2018) (alteration in original). The officer could not identify exactly what the driver was doing. *Id.* When the driver looked up and saw a police car next to him, he put his cell phone down. *Id.* The

---

[3]Oregon jurisprudence requires the higher probable cause standard to justify a traffic stop. *State v. Rabanales-Ramos*, 359 P.3d 250, 253 (Or. Ct. App. 2015). This in itself makes the Oregon cases of limited value to our reasonable suspicion analysis.

court concluded probable cause existed from the officer's observation of the defendant pushing on the screen and promptly lowering his phone when he saw the officer, distinguishing *Rabanales-Ramos. Id.* at 747. The officer's observation of the driver manipulating the phone was the primary difference between *Nguyen Ngoc Pham* and *Rabanales-Ramos*.

While these cases are distinguishable based on differences between the statutory prohibitions, it seems that the extent of conduct prohibited by the statute as well as the actual conduct observed by the officers are both critical to the reasonable suspicion analysis.

**D. Did the Officers Have Reasonable Suspicion Struve Was Violating Iowa Code Section 321.276 to Support an Investigatory Stop?** We turn then to the facts articulated by the officers to support the stop. Officer Blake was in the passenger seat of the patrol vehicle, and as the officers moved alongside the driver's side of Struve's car, Officer Blake observed the driver holding a cell phone in front of his face for at least ten seconds, which lit up the interior of the dark car, and saw the driver "manipulating the screen with his thumb as he was driving." The patrol car was beside and just behind the driver, which allowed Officer Blake "to view [Struve's] hands and the fact that his hand was up in front of his face with the cell phone and that he was manipulating the screen." Officer Blake testified the phone was "[u]p in front of the steering wheel, pretty much directly in front of [Struve's] face." The screen was "very bright," which allowed Officer Blake "to see [Struve's] thumb moving back and forth in front of it." Officer Schumacher, who was driving the patrol vehicle, likewise observed Struve holding the lit phone in front of his face and manipulating it in his hand. The thirty-second dashcam video introduced into evidence confirms that the cell phone was lit up during the entire approximate ten-second period during which the officers followed Struve

and assessed whether he appeared to be improperly using his cell phone. The officers suspected Struve was texting and stopped him to investigate.

The officers' commonsense suspicion that Struve was illegally using his cell phone is supported by empirical data reflecting that a large percentage of drivers admit to reading or writing texts while driving, even while recognizing such activity as dangerous. *See Glover*, 589 U.S. at ___, 140 S. Ct. at 1188 (citing statistics from the National Cooperative Highway Research Program and the National Highway and Traffic Safety Administration and concluding "[e]mpirical studies demonstrate what common experience readily reveals"). AAA Foundation for Traffic Safety, which conducts an annual survey concerning distracted driving, conducted its 2018 survey between August 21 and September 11, 2018, around the time of Struve's traffic stop. AAA Found. for Traffic Safety, 2018 Traffic Safety Culture Index 7 (2019) [hereinafter AAA 2018 Traffic Safety Index], https://aaafoundation.org/wp-content/uploads/2019/06/2018-TSCI-FINAL-061819_updated.pdf. While 96% of respondents considered reading or typing texts or emails while driving to be very or extremely dangerous, 41% of respondents admitted reading messages while driving and 32% admitted typing such messages within the last thirty days. *Id.* at 5. Of respondents aged 19–39, over 50% reported reading or writing a text while driving in the prior thirty days. *Id.* at 20.[4] The AAA Foundation observed the "survey again highlights the discordance between drivers' attitudes and their behaviors," recognizing similar responses in prior years' surveys. *Id.* at 4.[5]

---

[4]Respondents aged 25–39 were the worst offenders, with 60% admittedly reading a text and 54% typing a text while driving, even though 96% of that age group viewed such activity as very or extremely dangerous. AAA 2018 Traffic Safety Index at 18, 20.

[5]An article cited by the dissent provides further support for the general knowledge that a significant number of drivers engage in prohibited conduct, noting that "a [2007] study of adults from New York, New Jersey, and Connecticut revealed that eighty-six

*Glover* reinforces the importance of considering the commonsense understanding about human behavior and use of cell phones in assessing whether the officers had an objectively reasonable suspicion that Struve was engaged in a prohibited use of his cell phone. That commonsense observation, supported by empirical evidence that a significant number of drivers continue to read and write text messages while driving despite recognizing the serious dangers of doing so, also distinguishes the officers' observations of Struve's use of his phone from the hypothetical relied on to support the court's position in *Paniagua-Garcia,* 813 F.3d at 1015 ("Suppose the officer had observed Paniagua drinking from a cup that appeared to contain just coffee. Were the coffee spiked with liquor in however small a quantity, Paniagua would be violating a state law forbidding drinking an alcoholic beverage while driving, and that possibility, however remote, would on the reasoning advanced by the government and adopted by the district judge justify stopping the driver."). That there is only a remote possibility that a driver has Kahlua in his coffee does not negate the entirely different inferences to be drawn from a driver using his cell phone. The likelihood that a driver—observed holding a cell phone in front of his face for a prolonged period while manipulating the screen—is using the phone for a prohibited rather than a permitted use is more than a remote possibility. The empirical evidence supports the commonsense inference that it is quite likely a driver is impermissibly using his phone—for some age groups of drivers even more likely than not. *See Kreps,* 650 N.W.2d at 642 ("An officer may make an investigatory stop

---

percent of drivers ignore cell phone bans in their respective states." Alan Lazerow, *Near Impossible to Enforce at Best, Unconstitutional at Worst: The Consequences of Maryland's Text Messaging Ban on Drivers,* 17 Rich. J.L. & Tech. 1, 31 n.105 (2010).

with 'considerably less than proof of wrongdoing by a preponderance of the evidence.' " (quoting *Richardson*, 501 N.W.2d at 496–97)).

Our holding does not mean that an officer may stop any driver seen using a cell phone. For this point, we look to our cases involving observations that support stopping a driver on suspicion of impaired or drunk driving. In *Tague*, we held that observing a driver's "tires barely cross[ing] the edge line once for a very brief period" did not provide reasonable suspicion that the driver was impaired. 676 N.W.2d at 205. By contrast, observations of weaving within the driver's lane "several times," *id.* at 204 (discussing *State v. Tompkins*, 507 N.W.2d 736, 740 (Iowa Ct. App. 1993) (en banc)), or erratic speed changes and "veering . . . at sharp angles," *id.* at 204–05 (discussing *State v. Otto*, 566 N.W.2d 509, 510–11 (Iowa 1997) (per curiam)), provided reasonable suspicion that the driver may have been intoxicated. We reasoned that "any vehicle could be subject to an isolated incident of briefly crossing an edge line of a divided roadway without giving rise to the suspicion of intoxication." *Id.* at 205. We agreed with the district court that "it happens all too often" and described a number of innocuous activities that could have caused the isolated incident. *Id.*

Yet the cases where we found reasonable suspicion of impaired driving to support a stop did not involve activity consistent only with illegal conduct. Weaving within one's own lane and changing speeds without exceeding the speed limit do not violate any statute, but they do provide evidence of impairment. The difference between Tague's isolated and limited action and the repeated and more dramatic actions in *Tompkins* and *Otto* did not turn on whether the observed conduct was consistent only with illegal conduct to the exclusion of legal conduct, but whether it provided an objective indication of illegality.

Applying that reasoning here, not every driver seen using a cell phone in any manner may be presumed to be violating section 321.276. Iowa drivers legally use their cell phones every day. But at the same time, reasonable suspicion does not require an officer to rule out all innocent explanations. "The need to resolve ambiguous factual situations—ambiguous because the observed conduct could be either lawful or unlawful—is a core reason the Constitution permits investigative stops . . . ." *United States v. Miranda-Sotolongo*, 827 F.3d 663, 669 (7th Cir. 2016) (citing *Wardlow*, 528 U.S. at 125, 120 S. Ct. at 677). "Accordingly, reasonable suspicion may support an investigatory stop that ultimately reveals wholly lawful conduct." *Vance*, 790 N.W.2d at 780.

In the impaired driving context, observing a vehicle barely cross an edge line once does not rise to a reasonable suspicion of wrongdoing because a single incident could be caused by a number of innocuous reasons. Even though repeated swerving or crossing the lane lines is not itself illegal and could be explained by the same innocuous behavior as a single lane crossing, it still raises reasonable suspicion based on the commonsense understanding that such repeated actions can reflect impaired driving.

Likewise, merely observing a cell phone in a driver's hand reflects innocuous behavior. But additional observations can raise an officer's suspicions sufficient to justify an investigatory stop, even if the observations do not necessarily reveal prohibited as opposed to allowed activity. Here, the officers observed more than mere use of a cell phone. The officers followed alongside Struve and observed him holding the phone in front of his face for a significant period of time while manipulating it, actions consistent with improper use of his phone. That these actions may be consistent with proper use of a phone does not make the stop per se

unreasonable.  Our caselaw makes clear the officers were not required to rule out permitted activity before making an investigatory stop.  Indeed, a "tie" in the reasonable inferences to be drawn from the officer's observations lands the evidence on the reasonable side of the equation since "[t]he reasonable suspicion inquiry 'falls considerably short' of 51% accuracy."  *Glover*, 589 U.S. at ___, 140 S. Ct. at 1188 (quoting *United States v. Arvizu*, 534 U.S. 266, 274, 122 S. Ct. 744, 751 (2002)) (explaining that "[t]o be reasonable is not to be perfect" (alternation in original) (quoting *Heien v. North Carolina*, 574 U.S. 54, 60, 135 S. Ct. 530, 536 (2014)).

Struve's position that the officers were required to articulate observations consistent with illegal conduct to the exclusion of legal conduct clouds the distinction between a probable cause basis for a stop and a reasonable suspicion basis for a stop.  *See Glover*, 589 U.S. at ___, 140 S. Ct. at 1188 (explaining information needed to establish reasonable suspicion differs "in quantity [and] content than that required to establish probable cause" (quoting *Alabama v. White*, 496 U.S. 325, 330, 110 S. Ct. 2412, 2416 (1990))).  If an officer could actually see that the driver was viewing a social media app as opposed to a GPS screen, the officer would likely have probable cause to stop the vehicle based on the officer's observation of a traffic violation.[6]  *See Tyler*, 830 N.W.2d at 293 (holding that an officer who observes a traffic violation, however minor, has probable cause to stop the motorist).  The whole point of allowing officers to briefly detain motorists based on reasonable suspicion is to allow the

---

[6]The dissent likewise confuses probable cause and reasonable suspicion when it suggests an officer could only stop a driver if he could "make out the contents of the phone's screen" and "come to a conclusion about the phone function employed."  If the officer could see a text message or Facebook page visible on the screen, the officer would have probable cause to stop the driver.  Reasonable suspicion requires a lesser showing. *See Wardlow*, 528 U.S. at 123, 120 S. Ct. at 675–76.

officer to clear up any ambiguity about whether the observed behavior was illegal or not. *See Vance*, 790 N.W.2d at 780 (recognizing purpose of "an investigatory stop is to resolve the ambiguity as to whether criminal activity is afoot" (quoting *Richardson*, 501 N.W.2d at 497)).

We conclude that the officers' observations of Struve holding the lit cell phone in front of his face for at least ten seconds while manipulating the screen allowed them to briefly stop Struve and clear up the ambiguity created by his actions, particularly in light of the expanded coverage of activity prohibited by section 321.276. If these facts don't allow officers to stop a driver to investigate, it is hard to imagine what facts would. The legislature expanded the scope of section 321.276 and made it a primary offense to address the significant public safety issues associated with distracted driving caused by cell phones. To hold otherwise on the facts of this case would run the risk of "substantially reduc[ing], if not eliminat[ing], the effective enforcement of" section 321.276. *Morsette*, 924 N.W.2d at 441 (VandeWalle, C.J., dissenting); *see also Vance*, 790 N.W.2d at 782 ("[T]o forbid the police from relying on such an inference to form reasonable suspicion for an investigatory stop would seriously limit an officer's ability to investigate suspension violations because there are few, if any, additional steps the officer can utilize to establish the driver of a vehicle is its registered owner.").

Simply stated, the Fourth Amendment and article I, section 8 allow investigatory stops based on reasonable suspicion. This means there will be some circumstances when the individual will turn out not to have engaged in the unlawful conduct. This is true whether the stop involves investigating wrongful use of a cell phone or some other suspected misconduct as in *Glover, Vance,* and *Haas.* The circumstances and

inferences involved here are simply indistinguishable from the circumstances and inferences involved in those cases.

**IV. Conclusion.**

Struve's constitutional rights were not violated, and we affirm the denial of his motion to suppress.

**AFFIRMED.**

Waterman, Mansfield, and McDonald, JJ., join this opinion. McDermott, J., files a dissenting opinion in which Christensen, C.J., and Appel, J., join. Appel, J. files a separate dissenting opinion.

**APPEL, Justice (dissenting).**

I join in Justice McDermott's dissent. I write to emphasize that one of the central purposes of constitutional provisions related to search and seizure is to prevent arbitrary and capricious actions by law enforcement authorities. *See* Anthony G. Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn. L. Rev. 349, 417 (1974). When law enforcement has broad sweeping powers that permit widespread searches or seizures, the potential of arbitrary and capricious enforcement is front and center. A warrantless search and seizure with substantial risks of arbitrary and capricious enforcement is, at a minimum, constitutionally suspect. In my view, for the reasons expressed by Justice McDermott, the warrantless search crosses the line in this case.

It is no answer to say that officers should use an unarticulated "common sense" to circumscribe their broad discretion. No one advocates senseless law enforcement activity. But unarticulated "common sense" may be a cover for other motives, and even under the best of circumstances, may be a fertile ground for implicit bias to operate.

In my view, for the above reasons and the reasons expressed by Justice McDermott, the warrantless search under this statute cannot be sustained. I therefore respectfully dissent.

**McDERMOTT, Justice (dissenting).**

Under the majority's holding today, the legislature might as well have said the following: "Drivers: go ahead and use your phones for the uses we've permitted you. Police: pull them over and interrogate them if they do." As unjust as that sounds—as unjust as that *is*—it's now the status of the law in Iowa after today's ruling.

When a defendant challenges the reasonableness of a stop, the State must satisfy its burden with evidence. Not assumptions, nor guesswork, nor hunches. Whether a particular stop of a citizen is reasonable depends on the totality of the circumstances. In this case, there's only one circumstance: police officers saw a driver for about ten seconds holding up and touching his phone. That's it. No swerving, no speeding, no other basis for the stop. And on that fact alone, the court today holds as a constitutional matter that it's reasonable for law enforcement to assume a driver is engaging in one of a handful of prohibited uses of the phone—and not one of the innumerable permitted uses—and thus that it's reasonable to stop and interrogate the driver.

Stopping a vehicle and detaining its occupants unquestionably constitutes a seizure under both the Federal and Iowa Constitutions. *State v. Tyler*, 830 N.W.2d 288, 292 (Iowa 2013). It goes without saying that private citizens following the law generally should be free from government harassment. Yet today's ruling gives the State the authority to pull over and interrogate any driver seen glancing at a phone despite the State having *no idea* whether the driver is actually breaking the law. We can't excuse the State's failure to establish reasonable suspicion with evidence by accepting instead an *assumption* of illegal conduct. The unconstitutional police power sanctioned today should alarm anyone

concerned about the government's reach into citizens' private, lawful activities.

The law at issue in this case, Iowa Code section 321.276, permits drivers far more lawful uses of their phones than the majority acknowledges. Here's the text of the statute:

> A person shall not use a hand-held electronic communication device to write, send, or view an electronic message while driving a motor vehicle unless the motor vehicle is at a complete stop off the traveled portion of the roadway.

Iowa Code § 321.276(2) (2019).

> The statute defines electronic message this way:

> "Electronic message" includes images visible on the screen of a hand-held electronic communication device including a text-based message, an instant message, a portion of electronic mail, an internet site, a social media application, or a game.

*Id.* § 321.276(1)(*a*). With its use of the word "includes," the statute describes "electronic message" not with a statement of its exact meaning but rather with nonexclusive examples. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 132 (2012) (stating that the verb *to include* "introduces examples"). And here, somewhat awkwardly, the legislature's phrasing provides examples of an example: " 'Electronic message' *includes* images . . . *including* a text-based message." Iowa Code § 321.276(1)(*a*) (emphasis added).

The reference to "images" must be read in the context of the examples that illustrate it. This is because, unless the operation is voice activated or merely involves the volume buttons on the side of the phone, every operation of a smart phone involves images visible on the screen. Interpreting the term "electronic message" so broadly as to prohibit every smart phone operation that produces an image on the display expands the statute far beyond the manner it was written. If the legislature really

intended such a sweeping ban on phone use, it easily could have done so. The simplest and most obvious way for the legislature to create such a clear and all-encompassing prohibition is by exclusion: "All uses are forbidden except *x*." But it didn't. Instead, the legislature carved the forbidden boundaries with specific examples.

As a result, "images" must be interpreted in the context of the six "electronic message" examples set forth in the statute: text messages, instant messages, email, internet sites, social media applications, and games. Iowa Code § 321.276(1)(*a*). Those examples generally bear some logical connection to the term actually used in the statute: "electronic *message*." *See Porter v. Harden*, 891 N.W.2d 420, 427 (Iowa 2017) ("The legislature is . . . entitled to act as its own lexicographer," but "when the legislative definition of a term itself contains ambiguity, we should hesitate before veering too far from the common meaning of that term."). The word "message" connotes *communication* with another party. *See Message, Black's Law Dictionary*, at 1186 (11th ed. 2019) (defining *message* as "[a] written or oral communication, often sent through a messenger or other agent, or electronically (e.g., through e-mail or voicemail)"). And this communication focus comports with federal law too. Congress in the Federal Records Act defines "electronic messages" as "electronic mail and other electronic messaging systems that are used for purposes of communicating between individuals." 44 U.S.C. § 2911(c)(1).

Section 321.276, from its inception, has explicitly permitted drivers to make various lawful uses of their smart phones, including for GPS and navigation; calls, including entering a name or dialing a phone number; activating, deactivating, or initiating a smart phone function; and receiving safety-related information, including emergency, traffic, or weather alerts. *Compare* Iowa Code § 321.276(2)(*a*), (*b*)(3) (2010), *with* § 321.276(2)(*a*),

(*b*)(3) (2020).  But by omission from the list of forbidden uses, the statute permits far more.

When interpreting criminal statutes, "we have repeatedly stated that provisions establishing the scope of criminal liability are to be strictly construed."  *State v. Hearn*, 797 N.W.2d 577, 583 (Iowa 2011).  "Blurred signposts to criminality will not suffice to create it."  *United States v. C.I.O.*, 335 U.S. 106, 142, 68 S. Ct. 1349, 1367 (1948) (Rutledge, J., concurring).  Doubts in penal statutes are resolved in favor of the accused.  *State v. Conley*, 222 N.W.2d 501, 502 (Iowa 1974).  The universe of phone uses left unstated and unaddressed in the statute are all permitted uses.

A look at the smart phone applications ("apps," colloquially) that come preloaded on every iPhone (the iPhone being the most popular smart phone in the country based on market share) gives a sense of the scope of the permitted uses.  Out of the box, the iPhone currently comes with forty-four preloaded apps.  Under the examples of forbidden uses stated in the statute, drivers would be forbidden from using just four: *Messages* ("text-based message"), *Mail* ("a portion of electronic mail"), *Safari* ("internet site" web browser), and *Game Center* (a "game").  Drivers are thus permitted to use the other forty preloaded apps, including *Calculator*, *Calendar*, *Camera*, *Clock*, *Compass*, and *Contacts*—and those are just the preloaded apps starting with *C*.

A driver may make unlimited use of a smart phone's alarm clock, flashlight, stopwatch, timer, and magnifying glass features.  A driver may check the weather on the *Weather* app, download podcasts on the *Podcast* app, set reminders on the *Reminders* app, and create a grocery list on the *Notes* app.  We're far from done with even the preloaded apps on the iPhone that are permitted uses, and we haven't touched on the apps available for download from third parties.  At present, there are 1.85 million other apps

available for download on an iPhone through its *App Store.* Users of Google's Android phones have even more options, with 2.56 million apps available through the *Google Play* app. (And yes, searching and downloading smart phone apps is itself a permitted use while driving.)

A driver may lawfully use the phone to play streaming music or to select downloaded songs from a music app. A driver may also use a phone app to order food, trade stocks, shop for a book, check sports scores, measure heart rate, turn on a home security alarm, check in for a flight, read a newspaper article, diagnose car troubles, transfer funds between bank accounts, make a dinner reservation, pair a Bluetooth accessory, calendar an appointment, view traffic congestion reports, deposit a check, pull up digital concert tickets, track calories . . . and on, and on.

One might well complain that all these permitted uses under the statute could contribute to distracted driving and its associated dangers. Yet we must remember that it's the province of the legislature, not the courts, to make such policy choices and to establish acceptable levels of risk on our roadways. In exercising restraint against expanding the statute to make criminal the thousands of uses its text does not forbid, the judiciary upholds the constitutional separation of powers "by ensuring that crimes are created by the legislature, not the courts." *Matter of Bo Li,* 911 N.W.2d 423, 429 (Iowa 2018) (*quoting State v. Hearn,* 797 N.W.2d 577, 585 (Iowa 2011)); *see also United States v. Wiltberger,* 18 U.S. (5 Wheat.) 76, 95 (1820) (Marshall, C.J.) ("It is the legislature, not the Court, which is to define a crime, and ordain its punishment."). A court's own views about the consequences that might result from the proper interpretation of this or any other statute cannot weaken our resolve. Particularly where the legislature has spoken, "consequences cannot change our understanding of the law." *United States v. Davis,* 588 U.S. ___, ___, 139

S. Ct. 2319, 2335 (2019). Courts must avoid the temptation of "reading the law to satisfy their policy goals." *Id.*

The majority opinion doesn't suggest any disagreement with an interpretation of the statute granting such a wide assortment of permitted uses. Instead, the majority's analysis runs aground in its *assumption* that most phone use while driving is one of the few enumerated prohibited uses. Police officers of course must rely on reasonable inferences grounded in their experience and training as law enforcement officers, but today's holding doesn't rest on any evidence or assertion that the stop of this defendant's car was grounded in the officers' experience or training.

An officer positioned any normal distance from a moving vehicle can't see what particular phone function a driver is using. Was the driver looking at an email (a forbidden use) or a GPS map (a permitted use)? Tapping the screen to hit send on a text (forbidden) or to hit play on a song or a podcast (permitted)? Swiping the screen to scroll comments on a social media app (forbidden) or to scroll down a list of driving directions (permitted)? In every instance, the driver's actions look exactly the same. Lacking some extraordinary visual acuity to make out the small screen on a moving vehicle, the officer is left to guess. And guesswork, we have repeatedly said, can never establish "reasonable suspicion" for a stop under the constitution. *See, e.g., State v. Tague*, 676 N.W.2d 197, 204 (Iowa 2004); *State v. Kreps*, 650 N.W.2d 636, 641 (Iowa 2002); *see also United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 750 (2002) (requiring law enforcement to have a "particularized and objective basis for suspecting legal wrongdoing" to establish reasonable suspicion for a stop).

The majority seeks to clothe its naked guesswork about drivers' unlawful phone use not with observed or articulable facts but instead with a claim that such a conclusion can be drawn from "common sense." To

appreciate just how much of a load the term "common sense" is required to carry, one need only count the number of times the majority repeats the term in its opinion: by my count, nineteen times. Having repeated its claim that "common sense" permits the conclusion that any ambiguous phone use while driving can be reasonably assumed the illegal kind, the majority conjures "reasonable suspicion" for such police stops into existence.

This heavy conclusion collapses on the flimsy scaffolding that the premise supporting it provides. What the majority considers "common sense" tells us more about the justices' own beliefs about drivers' phone use than it does any actual activity supporting the stop. We must require more than smoky incantations of "common sense" to give rise to such a sweeping right for government intrusion. Reliance on some sixth sense about the driver's phone use—as opposed to the officer's actual articulable observations—sets the reasonable suspicion bar on the floor and, in my view, invites widespread abuse of citizens' constitutional rights.

What proportion of the many thousands of uses of a smart phone by drivers are the forbidden variety? I don't know—and neither does the majority. The survey data the majority cites (uncited by any party and absent from the record) certainly doesn't answer the question. The burden in proving a factual, articulable basis to support reasonable suspicion for a stop rests—as it always does, and always must—with the State. *State v. Tague*, 676 N.W.2d at 204. Cloaking a gut feeling with the words "common sense" isn't enough. "What it calls reasonable suspicion we call suspicion." *United States v. Paniagua-Garcia*, 813 F.3d 1013, 1015 (7th Cir. 2016) (Posner, J.). And mere suspicion is insufficient for the State to infringe the rights of law-abiding citizens under the constitution. *See, e.g., Tague*, 676 N.W.2d at 204; *see also* Radley Balko, *There's No Way to Enforce a Texting While Driving Ban*, CATO Institute: Commentary

(Oct. 13, 2009), www.cato.org/publications/commentary/theres-no-way-enforce-texting-while-driving-ban [https://perma.cc/2SLA-QFD5].

The facts of this case illustrate the absence of reasonable suspicion for the defendant's stop. The police officers observed Struve holding up the alighted phone at shoulder level for about ten seconds and swiping a few times at the screen with his finger. There's nothing about the height level at which he held the phone that makes Struve's use somehow more indicative of any forbidden use (e.g., viewing a text message) than any permitted use (e.g., viewing driving directions). Likewise, there's nothing revealed about the type of use from holding the phone for ten seconds; some shorter or longer duration (if it had been, say, five seconds or fifteen seconds) tells us nothing about whether it's a forbidden or permitted use. One could easily spend an equal amount of time scrolling through posts on a social media app (forbidden) as scrolling through a list of songs titles on a music app (permitted), or typing a text (forbidden) as typing an address for driving directions (permitted). The same goes for swiping the screen with his finger; both forbidden uses and permitted uses where the driver swipes the screen appear identical to an observer who can't make out the screen. "No *fact* perceptible to a police officer glancing into a moving car and observing the driver using a cellphone would enable the officer to determine whether it was a permitted or a forbidden use." *Paniagua-Garcia*, 813 F.3d at 1014 (emphasis in original).[7]

---

[7]Although irrelevant for purposes of the reasonable suspicion analysis upon which this case turns, Struve's counsel conceded at oral argument that his own claimed use of the phone while driving—to scroll through photographs—was a forbidden use under the statute. Not so. A driver viewing photos, without more, is not violating section 321.276. The majority twice references counsel's admission but—correctly—doesn't assert anywhere in its opinion that viewing photos while driving actually violates section 321.276. Struve never committed (nor even was charged with) any violation of section 321.276 that the police officers were investigating when they stopped his car.

For section 321.276 to be enforced as written, the observed driver would need to be moving slowly enough for an officer to see inside the vehicle, to make out the contents of the phone's screen, and to come to a conclusion about the phone function being employed. That's no easy task, but it's conceivable in some circumstances that an officer might be able to accomplish it. It didn't happen in this case, where the officers instead admitted to being unable to make out the contents of the phone's screen. To conduct a stop, the State must both have an articulable basis for their suspicion of criminal activity and that articulable basis must be objectively reasonable. *State v. Salcedo,* 935 N.W.2d 572, 579 (Iowa 2019). The stop in this case, based on an observation only that the driver was viewing and touching a screen, fails that test.

The majority concedes that today's opinion aligns us with the *minority* of courts that have addressed this issue. Admittedly, cases from other jurisdictions are of limited help in our analysis because each state without a hands-free law has a slightly different statute with varying permitted or forbidden uses. But there's a common thread in the case law running directly counter to our court's holding today. All but one of the cases from other jurisdictions found "reasonable suspicion" lacking where the police couldn't articulate a basis for the stop that suggested the driver actually engaged in forbidden (as opposed to permitted) use of the phone. *See Paniagua-Garcia,* 813 F.3d at 1014 (finding no reasonable suspicion under Indiana's statute); *State v. Morsette,* 924 N.W.2d 434, 438–40 (N.D. 2019) (finding no reasonable suspicion under North Dakota's statute); *Rabanalas-Ramos,* 359 P.3d 250, 256 (Or. Ct. App. 2015) (finding no reasonable suspicion under Oregon's statute). The only phone case supporting today's holding is a court of appeals ruling from Oregon—and it conflicts with the holding of another Oregon court of appeals case.

*Compare Nguyen Ngoc Pham*, 433 P.3d 745, 747 (Or. Ct. App. 2018), *with Rabanalas-Ramos*, 359 P.3d at 256.

Lacking support from the more analogous phone cases, the majority relies instead on vehicle registration cases. But those cases addressed reasonable suspicion for police stops involving unique vehicle registration issues, not use of smart phones while driving, and thus involve a completely different basis for articulating the reasonableness of a stop. The reasoning in those cases doesn't apply equally to the issues informing reasonable suspicion in this case, and thus they're of minimal value to us.

While reasonable suspicion doesn't require law enforcement to rule out the possibility of innocent conduct, *Kreps*, 650 N.W.2d at 642, the majority treats an unsupported hunch—that most phone use is the unlawful kind—as good enough to support a stop. And that's the real shortcoming of the majority's disposition in this case, which now authorizes that police here and henceforth may rely on speculation that a driver's use is one of the illegal varieties without any evidence that it really is. The assumption that every driver's ambiguous phone use is one of the handful of forbidden uses is contrary to our precedent, in which we've said that criminality "is never presumed." *Kutchera v. Graft*, 191 Iowa 1200, 1209, 184 N.W. 297, 301 (1921). Now, apparently, we can assume criminality whenever a driver glances at or touches a phone screen without knowing anything more.

The majority complains that requiring the police to possess specific and articulable grounds that a driver's phone use is one of the unlawful uses will hamper enforcement of this statute. But this is *as it must be* under our constitutional search and seizure protections. The constitution is "the supreme law" in our State. Iowa Const. art. XII, § 1. Constitutional protections are not held in abeyance or demoted to second-class status

simply because a legislative enactment is difficult to enforce as written. Enforcing a law like this one—with permitted phone uses and forbidden phone uses that appear absolutely identical to an observer—creates significant constitutional challenges. *See, e.g.*, Alan Lazerow, *Near Impossible to Enforce at Best, Unconstitutional at Worst: The Consequences of Maryland's Text Messaging Ban on Drivers*, 17 Rich. J.L. & Tech 1, 31–38 (2010). But it can never be the court's job to expand the text of criminal statutes to secure for the State greater ease of some particular method of enforcement.

The statute itself severely restricts an officer's ability to investigate whether any offense occurred. Subsection 3 of the statute states: "Nothing in this section shall be construed to authorize a peace officer to confiscate a hand-held electronic communication device from the driver or occupant of a motor vehicle." Iowa Code § 321.276(3) (2019). By its terms, the statute prevents the police from taking possession of the phone to determine whether the type of use the driver had been engaging in violated the law. So where, as here, an officer has no idea whether the driver's use of a phone is one of the forbidden types, the statute's own enforcement restriction means that the only way an investigatory stop could result in a ticket is if the officer gets the driver *to admit* to engaging in one of the forbidden uses. The roadside stop and seizure of the driver in these situations, with its seemingly complete reliance on self-incrimination, thus promotes little meaningful enforcement of this statute while imposing significant incursions on citizens' liberty interests.

A prior version of the statute explicitly addressed enforcement considerations by affirmatively *barring* the police from making stops based solely on a violation of this statute. When the legislature passed Iowa's first phone-related distracted driving law in 2010, the statute commanded

that the police "shall not stop or detain a person solely for a suspected violation of this section." Iowa Code § 321.276(5)(*a*) (2011). Instead the statute could be enforced "only as a secondary action when the driver of a motor vehicle has been stopped or detained for a suspected violation of another . . . law." *Id.* The prior version thus prevented the constitutional infringement at issue in this case. But the Legislature revised the statute in 2017 and eliminated this language. *See* Iowa Code § 321.276 (2018).

Many states have passed laws taking a clearer, more categorical, approach that forbids all phone use while driving except for voice-activated or "hands-free" operation. Hands-free laws (as the name implies) prohibit all drivers from using hand-held phones while driving. With hands-free laws, reasonable suspicion *does* exist for police stops based on drivers looking at their phone screens because all uses that involve looking at the screen while driving are unlawful. Such laws help address the enforcement problem section 321.276 presents with its few restricted uses and broad universe of permitted uses.

The willingness to engage in unfounded assumptions that ambiguous conduct is criminal conduct opens the door to many other unlawful stops being upheld. Say, for instance, an officer sees a driver take a drink from a can with the can's label obscured by the driver's hand. Is it a can of beer or a can of pop? As with the driver's cell phone use in this case, the officer is left to guess whether the conduct is the forbidden type. Under the reasoning adopted today, the possibility it might be beer and not pop, however remote, would justify stopping the driver. *See Paniagua-Garcia,* 813 F.3d at 1015 (describing a similar hypothetical). Citizens concerned with protection of their basic civil liberties might justifiably wonder how, and where, the court draws these lines moving forward.

Smart phones "are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." *Riley v. California*, 573 U.S. 373, 385, 134 S. Ct. 2473, 2484 (2014) (Roberts, C.J.). It is not hyperbole to say that *millions* of law-abiding Iowans risk suffering the inconvenience, humiliation, and violation of their rights that comes with the sweeping stop-and-interrogate right granted today to the government. Distracted driving is a serious matter, "but so is the loss of our freedom to come and go as we please without police interference." *Navarette v. California*, 572 U.S. 393, 414, 134 S. Ct. 1683, 1697 (2014) (Scalia, J., dissenting). Today's majority opinion risks infringing the constitutional freedoms of law-abiding drivers based on nothing more than suspicion. I respectfully dissent.

Christensen, C.J., and Appel, J., join this dissent.